FILED
2007 Jun-29 PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**

2007 JUN 29 AM 10: 00

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| N.D. OF ALABAMA | : |
| Respondent. | :Case No. 2:05-CR-0523-LSCPWG |
| | : |
| vs. | : Civil Docket No._____ |
| | : |
| FRANK C. BAIRD, II, | : CV-07-CO-8020-S |
| | : |
| Petitioner. | : |

**MEMORANDUM AND BRIEF IN SUPPORT OF PETITIONER'S**
**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**
**BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. §2255**

COMES NOW undersigned counsel on behalf of Petitioner, FRANK C. BAIRD II, and respectfully submits the following information pursuant to 28 U.S.C. § 2255.

Petitioner's sentence was imposed on June 28, 2006; however, the Judgment was not entered until June 30, 2006. No appeal was filed and therefore, with the tolling period of the ten (10) days in which Petitioner could have filed a direct appeal, the actual filing date under the AEDPA would be July 10, 2007. However, notwithstanding any other issue of tolling based on the Judgment and Commitment Order alone, Petitioner would have to file his 2255 Petition on, or before, June 30, 2007. Therefore, this Petition is timely filed.

1

**I.**

## COURSE OF PROCEEDINGS

Frank Baird, Petitioner, was indicted in the United States District Court for the Northern District of Alabama on February 7, 2006. Petitioner was later charged in a superseding indictment with multiple counts of possession of child pornography, traveling in interstate commerce for purposes of engaging in sexual conduct with another person, mailing, transporting and shipping child pornography, and criminal forfeiture. [R: 41].

A Motion to Suppress was timely filed followed by a Motion for Leave of Court to File an Amended Motion to Suppress. [R: 12 and 22]. An order to hear the Motion to Suppress was entered on February 17, 2006. [R: 26]. Counsel for Petitioner submitted a second Motion to Suppress on February 24, 2006. [R: 31]. A Motion to Withdraw the Motion to Suppress was filed by Petitioner's Counsel on February 28, 2006. [R: 32]. Petitioner entered a plea of guilty to Counts 1-5, and 12-23 of the Second Superseding Indictment on March 1, 2006. [R: 36]. Sentencing on these charges occurred on June 28, 2006, resulting in 1,190 months and 24 days incarceration. The judgment, however, was not entered on the Record until June 30, 2006. [R: 41]. The sentence imposed consisted of the following:

"A sentence of 120 months as to Count 1; 240 months as to Count 2; 240 months as to Count 3; 240 months as to Count 4; and 350 months and 24 days as to Count 12 separately, with each Count to run consecutive with each other; a sentence of 180 months as to Counts 5 and 13 through 23 separately, with each count to run concurrently with the other and to run concurrently with the sentence imposed in Counts 1 through 4 and Count 12 totaling an aggregated term of imprisonment of 1,190 months and 24 days pursuant to §5G1.2(d). As to Count 12, the sentence imposed is not a departure because the defendant has been credited for guideline purposes under U.S.S.G. § 5G1.3(b) with nine months and six days served in state custody, Jefferson County Circuit Court Case No. CC06-138 which will not be credited to the federal sentence under 18 U.S.C. § 3585(b)." [R: 41].

No direct appeal was taken in this case even though Petitioner claims that he wanted an appeal and, but for counsel's erroneous advice, he would have proceeded in withdrawing his guilty plea and filing an appeal.

**II.**

**STATEMENT OF FACTS**

This case involves allegations that on August 13, 2005, Detective Daryl Reed of the Jefferson County, Alabama Sheriff's Department was contacted by the Kimberly County, Alabama Police Department regarding an interview with an adult female. This adult female stated that she had information about child pornography. The adult female (hereinafter "Ms. Wade") told Detective Reed that an individual named Frank C. Baird (Petitioner), was paying women to have sex with him, and that he was videotaping sex acts and also taking photographs of the adult women while they posed nude. Ms. Wade stated that she had been told that Petitioner was posting the videos on the Internet. Ms. Wade stated that Petitioner paid her on three unknown occasions to have sex with him and to pose nude for him while he photographed her. Ms. Wade alleged Petitioner videotaped sex acts with her in a backroom at his tax business, AMTax, located in Warrior, Alabama. Ms. Wade also alleged that she knew of several juvenile females who were paid to have sex with Petitioner.

On September 9, 2005 Detective Reed was contacted by the Kimberly County Police Department regarding an interview with another adult female (hereinafter "Ms.

4

Gilland"). Ms. Gilland allegedly told Detective Reed that
she previously had worked for Petitioner at AMTax. Ms.
Gilland claimed that Petitioner paid her on numerous
occasions to pose nude while he photographed her. Ms.
Gilland also stated that Petitioner paid her to have sex
with him, and that she was photographed while engaged in
sex acts with Petitioner at his business, at a home rented
by Petitioner, and at a barn located at Petitioner's
residence on Arkadelphia Road. Ms. Gilland alleged that
Petitioner had photography equipment at all three of the
above locations. Ms. Gilland also alleged that she had seen
several juvenile females take money from Petitioner and go
into the back room of his business. One of the juvenile
females was alleged to have been approximately fourteen
years old. Ms. Gilland said she had no first hand knowledge
of what occurred in the back room between Petitioner and
the juvenile females but that they usually stayed for
approximately 30 minutes. Ms. Gilland gave Detective Reed
the first name of one of the juvenile females but did not
know the juvenile's last name.

On September 22, 2005, Jefferson County received a
dispatch to go the Turkey Creek area where two anonymous
citizens allegedly had seen a white male by the creek
allegedly taking pictures of a woman with her breasts

exposed. Deputy Gary Marbutt arrived first and allegedly saw a white female, later identified as a 17-year-old ("KW"), posing topless while a white male, later identified as the Petitioner, was taking photographs of her. KW's mother was present during these events.

Deputy Reed arrived on the scene sometime thereafter and Marbutt explained to Reed what he had observed. KW was seated in the back of one patrol car while Petitioner, not under arrest, and KW's mother were standing outside the patrol car. Deputy Reed directed the other deputies to place Petitioner and KW's mother in the back seats of separate patrol cars. Petitioner had neither been formerly arrested nor advised of his constitutional rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) before being placed in the patrol car.

Deputy Reed interviewed both KW and Petitioner while both of them were seated in separate patrol cars. Reports indicate that Petitioner, though not formerly arrested, nonetheless was advised of his rights and signed a written rights waiver form agreeing to speak with Deputy Reed. Petitioner supposedly stated to Deputy Reed that he was doing a favor for KW's mother by taking the photographs.

Shortly thereafter, evidence technician Deputy Yates arrived upon the scene. Yates was given, among other

things, a compact flash card that Deputy Carpenter found sticking out from behind the license plate of Petitioner's truck. Carpenter had not interviewed Petitioner and the search of the vehicle at that point was unauthorized in as much as consent was given by Petitioner and no search warrant had been obtained by law enforcement authorities. Deputy Craig Sanders gave Deputy Yates two rolls of used 35mm film that Deputy Sanders had taken from Petitioner's front pocket when Sanders patted Petitioner down. Deputy Reed told Yates that Petitioner had stated that a third roll of 35mm film was behind the door covering the gas cap of Petitioner's truck. Yates never got this information directly from Petitioner. Yates proceeded to collect the third roll of film from behind the door covering the gas cap. At this point, there was no evidence that anything on the film was illegal. Additionally, Petitioner had not yet been arrested and did not consent to the search. The contents of the two rolls of film removed from Petitioner's person were unknown at this time, there was no evidence of any known criminal act depicted on the film, and the film could not be categorized as a weapon.

Subsequent to these events, Petitioner, KW's mother and KW were transported to the Jefferson County Sheriff's Department. Petitioner was charged with complicity to

7

commit public lewdness, a violation of Alabama Code 1975, Section 13A-12-130. KW's mother and KW also were charged with other criminal acts. While Petitioner was detained at the police station, he was again read his Miranda rights and stated that he wanted an attorney.

Even though officials had enough time to detain Petitioner at Turkey Creek, transport him to the Jefferson County Sheriff's Department, and formally file criminal charges against him, they never sought to obtain a search warrant for the truck. It was not until Petitioner's truck was towed to the Jefferson County Sheriff's Department that a search warrant was ultimately requested. The search warrant, issued on September 22, 2005, allowed the Jefferson County Sheriff's Department to search Petitioner's truck, the compact flash card already seized from behind the license plate, the roll of film removed from behind the gas cap, and the two rolls of film found on Petitioners person. All of this evidence was seized before a warrant was issued.

On September 23, 2005, Deputy Reed obtained a search warrant for Petitioner's place of business. In doing so, the only evidence of any supposed wrongdoing having occurred at that location, were the non specific statements of Ms. Wade and Ms. Gilland. Moreover, there was nothing

8

about the incident at Turkey Creek that related to the earlier statements made by these two women and, nothing found at Turkey Creek related in any way to Petitioner's business. Three additional search warrants were later obtained on September 26, September 28, and September 29, 2005. The September 26 search warrant was for Petitioner's residence, located in Warrior, Alabama; the September 28 search warrant was for Petitioner's property, located at 315 Louisa Street in Warrior, Alabama; and the September 29, 2005 search warrant was obtained for the purpose of searching computers, peripheral devices, disks, CD's and other digital media storage devices that were seized pursuant to Search Warrant #2, Search Warrant #3, and Search Warrant #4.

Search Warrant (#1) subsequently was issued for the search of Petitioner's truck based on an affidavit made by Deputy Reed. On the following day, a second search warrant (#2) was issued for Petitioner's place of a business, a tax preparation office. The alleged basis for the second search warrant was that Petitioner supposedly was "operating a business without a license," namely a photography studio. In his affidavit, however, Deputy Reed incorrectly cited to Alabama code § 40-12-138. This code section relates to operating a pawnshop, while the relevant code section,

which was not incorporated in the affidavit or warrant, is § 40-12-140. The government asserted during the evidentiary hearing that this was a "scribner's error" but no evidence was tendered to the Court concerning such an error.

Deputy Reed's affidavit in support for Search Warrant (#2) stated that Tammy Wade, a 32-year-old adult female, told Reed on August 13, 2005, that Petitioner had taken photographs of her at some unspecified time in the previous two years and that Petitioner had paid Ms. Wade to photograph her.[1] Nothing was stated as to the illegality of such conduct or the specific time in which this conduct occurred. Additionally, the information was stale and uncorroborated as it related to Reed's application for a search warrant.

Deputy Reed's affidavit for Search Warrant #2 stated that Bonnie White did not hire Petitioner to photograph KW at Turkey Creek on September 22, 2005. In submitting this affidavit to the local Magistrate for approval, Reed failed to note that Petitioner previously had stated, "[T]he pictures were made by me as a favor to her mother."

Deputy Reed's affidavit for Search Warrant #2 also omitted information provided by Bonnie White, KW's mother,

---

[1] August 13, 2005 was over a month before the Turkey Creek incident.

and Petitioner, in which both women revealed that no transactions between the parties had ever occurred at Petitioners business: thus, indicating that no basis for entering Petitioner's business could be established for Warrant #2.

Deputy Reed's affidavit also claimed that the items recovered by law enforcement officials at Turkey Creek supported the earlier statements made by Ms. Wade and Ms. Gilland in which they had alleged that Petitioner was operating a photography studio without a business license in Jefferson County. The fact that Petitioner took photographs at Turkey Creek in no way implicates anything having to do with his personal business.

During the October 14, 2005 preliminary hearing in the State Court of Jefferson County, Deputy Reed testified that Bonnie White had told him that there were never any commercial transactions between Petitioner and herself or her daughter. During this preliminary hearing, Deputy Reed also testified that "anonymous sources" reported having supposedly received money from Petitioner to pose as models for Petitioner. During the hearing, counsel for Petitioner asked Deputy Reed whether any of the anonymous sources "had said that he (Petitioner) was charging people to take photographs of them or charging for the resultant

photographs, correct?", to which Deputy Reed replied, "No sir." Therefore, there was absolutely no proof that Petitioner had ever operated any business without a license. (These documents will be referenced as state case numbers 2005-11275 and 11276).[2]

In Petitioner's Amended Motion to Suppress, defense counsel enumerated several reasons why the evidence should have been suppressed. Counsel's reasons for suppressing the seized evidence were as follows:

1.  The searches and seizures of Petitioner's property were either without warrant or without probable cause or proper legal authority.

2.  The searches, as described above, along with the subsequent seizures performed and statements made by Petitioner violated Petitioner's Fourth and Fifth Amendment rights in that:

    a.  The original warrantless search of Petitioner's truck was not incident to a lawful arrest, and was without probable cause and proper legal authority;

    b.  The searches and seizures conducted pursuant to search warrants #1 and #2 were the fruits

---

[2]     The tape recording of this hearing was transcribed by Theresa Bretch, C.C.R. (Certified Court Reporter) on June 12, 2007.

12

of the initial illegal, warrantless search
of Petitioner's truck;

c. The searches and seizures conducted,
pursuant to search warrants #1 and #2 were
done without probable cause; and

d. All items seized, and statements obtained,
in subsequent search warrants #3 and #4 were
fruits of the illegal searches described
above.

The illegal searches were predicated upon, but were
not limited to, unreliable anonymous tips; unreliable and
stale information; and searches of seized property without
due process of law.

Petitioner withdrew his Motion to Suppress and entered
a plea agreement based upon advice from his attorney that
such decisions would result in a reasonable sentence.
Included in the plea agreement was the following:

"Counsel has explained to the defendant, that in
light of the United States Supreme Court's recent
decision in United States v. Booker, the Federal
Sentencing Guidelines are advisory in nature . .
. The defendant agrees that, pursuant to this
agreement, the Court may use the facts and
findings by a preponderance of the evidence to

13

reach an advisory guideline range and defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt . . . Defendant waives his right to appeal his conviction and sentence on both direct and collateral appeal, so long as the sentence is within the advisory guideline range, as that range is determined by the court . . . The defendant understands and agrees that this is a binding waiver that prevents him from filing an appeal regarding the length or imposition of the sentence."

(Plea Agreement, p. 7)(Emphasis added). (Plea Agreement, Exhibit A)

The plea agreement also stated:

"Should the defendant ask the court to impose a sentence below the advisory guideline range on any basis, including but not limited to factors in 18 U.S.C. 3553, the government will consider this agreement null and void…"

These conditions created an ambiguous and illusory plea that was in conflict with the statutory requirements of 18 U.S.C. 3553. These plea provisions required Petitioner waive his Booker rights. Petitioner, without

14

knowing what sentence may be imposed under the advisory guidelines, subjected himself to a plea that was neither knowingly nor intelligently entered.

Petitioner was then, post plea, faced with a terrifying pre-sentence report that resulted in a guideline range of life in prison. Clearly, Petitioner was never notified pre-plea that such a harsh sentence would be imposed as a result of his plea. Such a substantial sentencing guideline range requires some pre plea notice in light of the fact that plea agreements of this nature are completely without any *quid pro quo*. What did Petitioner gain by a plea of guilty? Nothing.

As part of the pre-sentence report several guideline issues were objected to by counsel. (See Objections, Exhibit B). The consequences of the pre-sentence report created several conflicts including, but not limited to, the grouping of all of the counts pled to, even though the counts were related to the same relevant conduct (two victims). This resulted in an inordinate amount of grouping points, (9), which increased the offense level by 5 points from an adjusted offense level of 38.[3] Petitioner states there should only be two (2) grouping points. The PSR

_____

[3] The adjusted offense level from the most serious grouped count was Count 37.

15

adjusted offense level was 43 with 3 points deducted for acceptance of responsibility leaving a total offense level of 40. (PSR, paragraphs 107, 108, 109). However, subsequent to these findings, a Chapter 4 enhancement was applied resulting in an additional 5 levels pursuant to U.S.S.G. §4B1.5. This enhancement concerns defendants who engage in a pattern of activity involving prohibited sexual conduct. This enhancement should not have been applied to Petitioner after all of the other adjustments were given, because doing so made the acceptance of responsibility credit meaningless.

Based on Chapter 5, Part A, the base offense level could be no more than 43 and the acceptance of responsibility should be deducted from that level to avoid a miscarriage of justice, cruel and unusual punishment, and a violation of due process rights. Petitioner's sentence was increased without a determination by a jury of the factors identified in §4B1.5.[4] Petitioner states an incorrect application of the guidelines issue subjects him to waiving Apprendi v. New Jersey rights.[5]

---

[4]   Petitioner waived his right in the plea to challenge jury findings, however, this waiver was based on erroneous advice of counsel.

[5]   530 U.S. 466, 120 S. ct. 2348 (2000).

16

At sentencing, the Court reviewed several, but not all, of the factors to be considered under 18 U.S.C. 3553 before imposing a sentence of life in prison. If the Court could review these factors, Petitioner had a right to address them as well. The Court did not, however, address the sentence pursuant to 18 U.S.C 3553(a)(6), which was the requirement that a sentence should avoid unwarranted sentencing disparity among similarly situtuated defendants. Counsel did not object to the procedures used to impose the sentence or to the sentence itself.

## II.

## ISSUES PRESENTED

### ISSUE I

**COUNSEL WAS INEFFECTIVE FOR COUNSELING PETITIONER TO DISMISS THE MOTION TO SUPPRESS IN EXCHANGE FOR A PLEA IN WHICH PETITIONER WAS SENTENED TO LIFE IN PRISON.**

**1. Counsel Was Ineffective In Failing To Prosecute The Motion to Suppress In Exchange For A Plea That Would Result In A Reasonable Sentence. Petitioner Would Have Prevailed On The Motion to Suppress.**

Petitioner asserts that his trial counsel was ineffective for advising him to dismiss his Motion to Suppress in exchange for what Petitioner believed would be a reasonable and fair plea and sentence. Although this Honorable District Court asked Petitioner if he understood he was withdrawing his Motion to Suppress, without knowing

what sentence he was exposed to, such a waiver was not knowingly or intelligently entered. (Plea Transcript p. 26). The test for the prejudice prong of an ineffective assistance of counsel claim relating to the entry of a guilty plea is focused on whether, if counsel had not performed ineffectively, the defendant still would have pleaded guilty. Hill v. Lockhart, 474 U.S. 52, 59 (1985). Petitioner states he would not have.

By failing to prosecute the Motion to Suppress, counsel was ineffective *per se* in that the motion could have prevailed and a different outcome to Petitioner's case would have occurred. Petitioner gained no *quid pro quo* from his plea agreement.[6]

The law is clear that, "the burden falls upon the government to demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983). Moreover, the constitutional reasonableness of the search rests with the government. *See* United States v. Impson, 482 F.2d 197 (5th Cir. 1973). Significantly, counsel's initial Motion

_____

[6] 1,190 months plus 24 days incarceration is nothing less than a life sentence even though the words "life in prison" were not used.

asserted that the search of Petitioner's vehicle was unconstitutional. A Motion to Suppress is reasonable in post-conviction if Petitioner did not have a fair and complete review of the issue. Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037 (1976). United States v. Johnson, 457 U.S. 537, 102 S.Ct. 2579 (1993). In an unconditional plea a Fourth Amendment right is generally waived (See for example U.S. v Markling, 7 F.3d 1309 (7th Cir 1993); Smith v. U.S., 876 F.2d 655 (8th Cir 1989); Berry v. Wainwright, 546 F.2d 1204 (1977). However, counsel's failure to litigate a Fourth Amendment issue based on ineffective representation is not barred from 2255 review. *See* Stone v. Powell, 428 U.S. 46, 49 S.Ct. 3030 (1976).

## A.    **Search of Petitioner's Truck**

As stated in the above referenced facts, a deputy for the Jefferson County Sheriff's Department was dispatched to Turkey Creek Recreational Center in response to an anonymous complaint alleging that an individual was taking pictures of a topless woman. Upon arriving to investigate the matter Deputy Marbutt encountered a 17-year-old being photographed topless by Petitioner, while her mother looked on. Identification was requested and given to the deputy. Other deputies from the same sheriff's department were dispatched to the location. One of those officers, having

searched Petitioner, confiscated two rolls of film from his person; the depictions contained therein were unknown. The rolls of film were not weapons and, after they were seized, there were no further allegations of continued criminal acts or wrongdoings by any of the suspects.

At that point nothing else should have occurred. Authorities may only conduct a warrantless search of an automobile after they determine first whether the automobile is operational and second whether probable cause exists to believe it contains contraband. Maryland v. Dyson, 527 U.S. 465, 467 (1999). Before either of these determinations were made, however, another deputy sheriff who had been dispatched to the Turkey Creek area, Deputy Carpenter, retrieved a compact flash card he found sticking out from behind the license plate of Petitioners truck.

Carpenter's search of Petitioner's automobile was illegal. First, Carpenter failed even to speak with Petitioner before he searched his truck and, as a result, never received consent to conduct the search. Second, since consent was not given, and a warrant had not yet been obtained, under the test set forth in Maryland v. Dyson, in order to search the truck there must have been probable cause to believe that the automobile contained contraband.

In addition to the seizure of the compact flash card, Deputy Sanders also gave Deputy Yates the two rolls of film seized from Petitioner's front pocket even though there was no evidence that the contents of those rolls of film were illegal and Petitioner had not then been charged with a crime. Finally, Detective Reed told Deputy Yates that Petitioner had stated that a third roll of 35mm film was behind the door covering the gas cap of Petitioner's truck. No consent to retrieve this roll of film was given by Petitioner to Reed or Yates.

The first step is to analyze whether the circumstances surrounding the instant matter constitute a "Terry Stop" in compliance with Terry v. Ohio, 392 U.S. 1 (1968). A protective sweep exception has been analogized to an investigative stop and frisk. These types of stops and frisks are based upon the safety of the police officers. Furthermore, a protective sweep is allowed so that authorities may search for either weapons or other types of dangerous items, categories in which a roll of film surely cannot be classified.

The warrantless search of an automobile is constitutional if officers, acting as a result of their combined knowledge have probable cause to search the automobile and if exigent circumstances justify failure to

secure a warrant. U.S. v. Gualtney, 581 F.2d 1137 (11th Cir. 1978). The ultimate test is that the search must be reasonable under the circumstances, as viewed objectively. Id. Here, there is no evidence that obtaining a warrant prior to any additional seizures would have been impractical, particularly since Petitioner was detained in the police vehicle and later transported to the police station. Even assuming arguendo that the items seized from Petitioner's pocket had some inference of misconduct, that which was seized from the vehicle could not reasonably have been determined by the law enforcement officials to be related to whatever a seizure and subsequent warrant on the film would produce.

**B. Search Warrants Obtained After Petitioner Had Been Transported to the Police Station**

1. Warrant #1 Affidavit of September 22, 2005 (Exhibit C)

In his affidavit Officer Reed claimed that he needed a warrant to review the materials seized from Petitioner and his vehicle and that the warrant should be granted on the grounds that the truck was being towed and the items were removed as a result of the danger of these items being lost while that event occurred.

The question here turns on the lawfulness of the original seizure and not upon the subsequent request for a

search warrant from the illegally seized items. First, a frisk of an individual must be supported by reasonable fear for the safety of officers or others. U.S. v. Hammack, 604 F.2d 437 (5th Cir. 1979). In this regard, an officer who has a reasonable suspicion that an individual is engaged in an illegal activity and is armed with a concealed weapon is justified in conducting a pat down for weapons. U.S. v. Hunter, 291 F.3d 1302 (11th Cir. 2002).

Authorities may only conduct a warrantless search of an automobile after they determine that the automobile is operational and that probable cause exists to believe it contains contraband. Maryland v. Dyson, 527 U.S. at 467. Again, no probable cause existed to believe that Petitioner's automobile contained contraband. The anonymous caller only indicated the presence of a camera, which was being used to take pictures of a topless woman. The anonymous caller did not report the presence of additional equipment, weapons, pictures or anything of the like, just a man taking photographs of a woman. Upon their arrival, authorities were able to secure the camera that the anonymous caller reported. After securing the camera, there was absolutely no reason for authorities to believe that additional evidence existed or for authorities to search Petitioner's automobile.

Additionally, no inventory search was alleged to be the basis for the seizure of Petitioner's property and, the seizure was done without contention of an interest in an inventory search, which itself may have been unlawful. Furthermore, unlike as was alleged in Deputy Reed's affidavit, no evidence was ever presented which would tend to show that towing the vehicle to the police station would have resulted in the loss of any of the items illegally seized at Turkey Creek. Therefore if there was probable cause to get a search warrant for the truck at all since Petitioner was transported to the police station, officers had time to watch the truck and wait for a warrant.

Deputy Reed's affidavit for the truck warrant is defective. The affidavit fails to identify the two witnesses interviewed who stated that Petitioner was taking pictures of minor children. (The two adult females interviewed were not related to the Turkey Creek incident). Second, the affidavit was incomplete concerning the basis for which the deputy's experience can establish probable cause that Petitioner's vehicle search was lawful. The basis for this affidavit was simply to review the materials already seized even though no original warrant was obtained in order to seize them. The affiant's statements suggested that there should somehow be retrospective exigent

circumstances and probable cause factors established to support the seizure of the items from the truck.

Here, without making a single effort to obtain a search warrant, deputies of the Jefferson County Sheriff's Department illegally searched Petitioner and his automobile. In doing so, authorities illegally took possession of two cameras, two rolls of film, and a cell phone from Petitioner, along with a compact flash card and an additional roll of film from his automobile. As has been previously articulated by the United States Supreme Court, evidence seized during an unlawful search cannot constitute proof against the victim of the search, and the exclusionary prohibition of the Fourth Amendment extends to indirect, as well as, to direct products of such illegal invasions. Wong Sun v. U.S., 371 U.S. 471 (1963). Since the initial search of Petitioner's person and automobile were both illegal, Deputy Reed's search warrant to review the fruit of that search should never have been granted.

2.   Warrant #2 Second Affidavit (Exhibit D)

On September 23, 2005, a second search warrant was requested in order to search Petitioner's tax preparation business, AMTax. The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that a criminal offense has been committed and

that evidence exists at the place for which the warrant is requested. U.S. v. Betancourt, 734 F.2d 750 (11th Cir. 1984)(Emphasis added).

Here, there was no probable cause to believe that either a criminal offense had been committed at Petitioner's business or that evidence existed at that business related to Turkey Creek. First, in his affidavit for the second search warrant, Deputy Reed alleged that the warrant was requested because local authorities believed that Petitioner was "operating a business without a license." However, in requesting the search warrant, Reed used the wrong statute, claiming Petitioner was in violation of § 40-12-138, which relates to pawnbrokers.

Second, in his affidavit in support of the second search warrant, Deputy Reed claimed to have been told by Tommie Wade, a 32-year-old adult female, that Petitioner had photographed her at some unspecified time over the prior two years and that Petitioner had paid Wade to allow him to take those photographs. Deputy Reed also alleged that another individual, April Gilland (Butler), a 27-year-old adult female, had also allowed Petitioner, at an unspecified time, to photograph her. In both cases it is important to note that both women were unable to remember when the photo shoots had taken place. Assuming that the

photographs were taken, Petitioner still committed no crime by merely taking photographs of these consenting, adult women.

Third, in Reed's affidavit he claimed that on September 22, 2005, the very same day as the Turkey Creek incident, he conducted surveillance on Petitioners business. It is curious, however, that in making this claim, Deputy Reed never identified what, if anything, he observed at AMTax, and provided no information that would tend to even marginally corroborate the statements of the two adult females referenced above or identify any illegal activity was present on the business premises. The mere fact that Deputy Reed claimed to have conducted surveillance, without providing further evidence or information, was not sufficient evidence to support granting his affidavit for a search warrant of the business premises. Nothing seized from Petitioner on September 22, 2005, at Turkey Creek, related to Petitioner's business.

Fourth, the Turkey Creek incident had no retrospective relationship to Petitioner's business, as there is no evidence that the photographs that Petitioner took at Turkey Creek were in any way connected to his place of business.

Probable cause for a warrant to search exists only when there is a fair probability that contraband or evidence of a crime will be found. U.S. v. Virden, 2007 WL 1672331 (11th Cir. 2007). There was no proof that any criminal acts had ever taken place at Petitioner's place of business. Neither Ms. Wade, nor Ms. Gilland, reported any criminal behavior, only speculation, to the police; Deputy Reed had no information that criminal acts had occurred at AMTax; and the code statute that Petitioner was accused of having violated related solely to pawnbrokers, an occupation that Petitioner was not engaged in.

The only question to be resolved when it is claimed that evidence obtained subsequent to an illegal search or seizure is "tainted" or is "fruit" of prior illegality is whether the challenged evidence was come at by exploitation of the initial illegality or, instead, by means sufficiently distinguishable to be purged of the primary taint. *See* Segura v U.S., 468 U.S. 796, 798 (1984).

Independent of the illegal first search warrant, the second search warrant, for Petitioner's business, was also illegal and in violation of Petitioner's Fourth Amendment rights. Clearly, the suggestion that Petitioner was in violation of an administrative, non-criminal, offense for operating a business without a license was a pretext to

search a business that the authorities had no right to search.

3.  Warrant #3 Affidavit of September 26, 2005 (Exhibit E)

The third search warrant applied for by Deputy Reed related to Petitioner's home, which is located at 601 Arkadelphia Road. As was previously held by the Eleventh Circuit Court of Appeals, "[A] search warrant that fails to sufficiently particularize the place to be searched, or the things to be seized, is unconstitutionally overbroad, and the resulting general search must be deemed unconstitutional." U.S. v. Travers, 233 F.3d 1327 (11th Cir. 2000). Moreover, in U.S. v. Burke, 784 F.2d 1090 (11th Cir. 1986), the Court further determined that when the only information included on the affidavit for a search warrant is the building number, the warrant does not fail for overbreadth if the warrant contains a detailed physical description of the building.

Here, when viewing the warrant it becomes immediately clear that no specific address is identified on the warrant and the extent of the physical description of the building is limited to, "single story red brick house with the number 601 located on the power meter on the house in Jefferson County, Birmingham Division." The descriptive phrase, "single story red brick house with the number 601,"

is surely not enough information to be declared "a detailed physical description of the building."

Here, the affidavit attached to Deputy Reed's warrant was based on the September 22 events at Turkey Creek, along with additional interviews in which Deputy Reed participated. In his affidavit, Deputy Reed stated that he interviewed Tommie Wade. During his interviews with both women they alleged that Petitioner had photographed them at his place of business. Reed's affidavit, for warrant #3, was incomplete in that it gave no timetable for when the alleged activity occurred. The affidavit also alleged that Reed conducted surveillance of Petitioners business on September 22, 2005. Moreover, no specific time frame for when the surveillance occurred was stated in the affidavit. Even if the surveillance did take place nothing was noted in the affidavit that suggests criminal activity was taking place or did occur at this location. Several paragraphs in Reed's affidavit detail his continued involvement with Petitioner during the course of the entire day on September 22, 2005. The question arises as to how it was that Reed was able to participate at Turkey Creek, remain with Petitioner during the course of the day, and conduct surveillance of Petitioner's business all at the same time.

The events that occurred at the time Petitioner was encountered at Turkey Creek are the events that must be reviewed for purposes of any subsequent search warrants. If the first or second search warrant was illegal, then any subsequent search warrants supported by information received from the first or second illegal search should be considered fruit of the poisonous tree.[7] *See* Wong Sun v. U.S., 371 U.S. 471 (1963). There is no nexus between the events at Turkey Creek and subsequent searches.

The third affidavit also stated, in support of searching Petitioner's residence, that "the film that was recovered had photographs of Kimberly White ("KW") and she was also posing, both posed for nude photographs that were taken at the site where Mr. Baird was arrested." Deputy Reed further asserted that, "this supports the statements from the witnesses above that Mr. Baird is operating a photography studio without a business license in Jefferson County."

Deputy Reed's assertions here are incorrect. First, the statements taken from Ms. Wade and Ms. Gilland included no time frame from which one could discern when the alleged activities involving them actually, if ever, took place.

_____

[7] This does not mean that each search warrant itself cannot be analyzed individually as a basis for a violation of Petitioner's Fourth Amendment rights.

31

Second, the statements made by the two women were taken before the incident at Turkey Creek occurred and were in no way related to Turkey Creek. Third, the statements made by Wade and Gilland were not supported by any evidence, or information, obtained at Turkey Creek, and nothing that was searched, seized, or reviewed at Turkey Creek reflected any indication that something illegal had ever occurred at Petitioner's business. Deputy Reed took Wade and Gilland's statements out of context when he tried to relate them to the events at Turkey Creek.

4.    Search Warrant #4, September 28, 2005 (Exhibit F)

A fourth search warrant was obtained for a residence located at 315 Louisa Street in Warrior, Alabama. In Deputy Reed's affidavit in support of this search warrant much of the information provided was based upon materials seized pursuant to the execution of the first three illegal warrants. Therefore, this warrant was the fruit of the poisonous tree and could not have been issued but for the illegal search and seizure of the materials subject to the first three warrants. *See* Wong Sun v. U.S., supra.

5.    Search Warrant #5, September 29, 2005 (Exhibit G)

Another affidavit was prepared in support of a search warrant requesting the search of four computers, peripheral devices, disks, CDs and other digital material and media

storage devices that were seized during the searches conducted on September 23rd and September 26th at the business and residence of Petitioner. The items subject to search were seized through illegal means and therefore fruit of the poisonous tree and should not have been seized or searched. *See* Wong Sun v. U.S., supra.

## C.   Counsel's Withdrawal of Petitioners Motion to Suppress Amounted to Ineffective Assistance of Counsel

Petitioner had a colorable claim for suppression of evidence seized at the time of the Turkey Creek incident and the subsequent warrants. Petitioner believed, however, that he was receiving a benefit for the bargain of withdrawing his Motion to Suppress by pleading guilty.

Upon information and belief, trial counsel advised Petitioner that he would receive a reasonable sentence and never advised Petitioner of the guidelines that would apply based on the guidelines as evidenced in the pre-sentence report. Petitioner had no idea, until the pre-sentence report was revealed to him, that these issues would implicate a life sentence. The plea agreement was ambiguous, illusory, and other than informing Petitioner of the statutory parameters of the crimes he pled guilty to, did not inform Petitioner of any relationship of the guidelines to the statute other than to state that the

Court would consider the guidelines as advisory. (Plea Transcript p.14).

Based on the aforementioned circumstances, it appears that trial counsel was unprepared to deal with the suppression matter, and that trial counsel was also unprepared to deal with issues surrounding Petitioner's plea agreement and eventual sentence. The question that begs review is what exactly was trial counsel's advice to Petitioner the application of the sentencing guidelines and whether such advice was rendered in writing to ensure that Petitioner completely understood the scope and magnitude of his case when he agreed to be sentenced to the advisory guidelines with no appeal rights.

### ISSUE II

**COUNSEL WAS INEFFECTIVE FOR WAIVING PETITIONER'S BOOKER RIGHTS AND THE PLEA AGREEMENT WAS ILLUSORY AND AMBIGUOUS**

The plea agreement contained confusing and ambiguous language that made the plea illusory and one sided. The plea stated in pertinent part:

"Counsel has explained to the defendant, that in light of the United States Supreme Court's recent decision in United States v. Booker, the Federal Sentencing Guidelines are advisory in nature . .

34

. The defendant agrees that, pursuant to this agreement, the Court may use the facts and findings by a preponderance of the evidence to reach an advisory guideline range and defendant explicitly waives any right to have those facts found by a jury beyond a reasonable doubt . . . Defendant waives his right to appeal his conviction and sentence on both direct and collateral appeal, so long as the sentence is within the advisory guideline range, as that range is determined by the court . . . The defendant understands and agrees that this is a binding waiver that prevents him from filing an appeal regarding the length or imposition of the sentence."

(Plea Agreement, p. 7)(Emphasis added). (Plea Agreement, Exhibit A)

The plea also stated:

"Should the defendant ask the court to impose a sentence below the advisory guideline range on any basis, including but not limited to factors in 18 U.S.C. 3553, the government will consider this agreement null and void…"

Petitioner waived any right to appeal any sentence that was not based on the advisory guidelines "as found by the court", and could not address the U.S.C. 3553 factors, thus implicating that Petitioner was waiving his Booker rights. Notwithstanding this conflict, Petitioner was not advised of the scope of what those guidelines would be, advisory or not.

In Williams v. U.S., 396 F.3d 1340 (11th Cir. 2005), the Court of Appeals held that a valid sentence waiver, pursuant to a plea agreement, precluded the movant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel. Sentence appeal waivers are only valid, however, when made knowingly and voluntarily. Williams, supra, 396 F.3d 1340. When a lawyer grossly miscalculates the guidelines, causing his client to agree to plea based upon erroneous calculations, and that defendant subsequently unknowingly waives his right to appeal his sentence, said actions of the attorney and defendant are subject to further review by this Court pursuant to 28 U.S.C. § 2255. See Lattimore v. U.S., 185 Fed.Appx. 808 (11th Cir. 2006).

The plea agreement implies that Petitioner waived his Booker rights and agreed to be sentenced under the advisory guidelines. It was ineffective assistance of counsel to

36

allow such a waiver to occur, if it was even lawful to do so at all.[8]

In U.S. v. Magouirk, 468 F.3d 942 (6th Cir. 2006) the Sixth Circuit determined that a defendant can waive his Booker rights. However, in U.S. v. Zamora-Vallejo, 470 F.3d 592 (5th Cir. 2006), the Fifth Circuit determined that a defendant could not waive Booker rights and that the entire statute had to be considered when imposing a sentence.[9]

Here, the government would allege that Petitioner is barred from bringing his challenge, under the terms of the plea agreement, because counsel waived Petitioner's Booker rights. This argument is foreclosed, however, by U.S. v. Reyes-Celestino, 443 F.3d 451, 453 (5th Cir. 2006), in which the Court held, under a similar set of circumstances, that a defendant who agrees to be sentenced pursuant to the applicable Sentencing Guidelines is not precluded from

---

[8]    The District Court despite this waiver reviewed 18 U.S.C. 3553 factors but specifically left out the question of disparity. Counsel did not object to any of this.

[9]    Allowing defendants to agree to be sentenced within the advisory guideline range creates both good and bad potential results without disclosure of what those guidelines, pre-plea, would be. Some might say that the guidelines could be more favorable implicating that other 3553 factors could aggravate a potential sentence while others, would clearly say that pleading to an advisory guideline range and not the entire statute would result in a sentence clearly not contemplated by a plea due to the life sentence that was imposed.

raising on appeal an alleged error. Furthermore, in U.S. v.
Martinez, 263 F.3d 436, 438 (5th Cir. 2001), the Court also
held that "we must construe all ambiguities in the plea
agreement against the government."

In light of the facts in this case it cannot
unambiguously be said that Petitioner agreed to a mandatory
application of the Guidelines for a life sentence.
Moreover, under the Court's holding in Martinez, any
ambiguity with regard to the plea agreement must be
construed against the government. *See* 263 F.3d at 438
(Emphasis added). Under the facts in this case, it cannot
be said that counsel for Petitioner was allowed to waive
Petitioner's Booker rights. As a result, trial counsel
committed ineffective assistance of counsel by doing so.
This is not cured by the Court's review of some 3553
factors as counsel failed to file a Sentencing Memorandum
to address the statute due to the conflicting language of
the plea agreement to not contest a sentence in the
advisory guideline range.

The plea prohibited Petitioner from discussing variant
sentencing factors applied to 18 U.S.C. 3553 and yet be
bound by the courts advisory guideline findings. This made
the plea a binding mandatory sentence in the guidelines in
violation of Booker. First, there was no range of

sentencing to consider. Second, the court discussed 3553 factors, yet counsel for Petitioner did not respond to the courts 3553 analysis. Third, the court specifically did not discuss a critical 3553 element, (a)(6), and counsel did not object or address this at all.

The terms of the plea were ambiguous and illusory. Counsel did not put on any significant mitigating information that would aid the court in the sentencing process in applying the guidelines in conjunction with other 3553 factors. Once the court discussed its consideration of the 3553 factors counsel was free to respond to them, object to the courts findings or address these factors further. The plea restrictions amounted to a one sided illusory contract. However, even with the plea restrictions on 3553 arguments, counsel did not consider the implications of such restrictions or the fact that it was the court that raised the Booker issues thus alleviating counsel's obligation to not raise these issues. Counsel could have responded to the Courts discussion of the 3553 factors without breaching the plea. Additionally counsel's failure to move to withdraw such a plea constitutes ineffective assistance.

### ISSUE III

**COUNSEL WAS INNEFFECTIVE FOR FAILING TO
EXPLAIN THE GUIDELINES ADEQUATLEY OR
REQUEST A PRE PLEA PSR DUE TO THE SEVERITY
OF THE GUIDELINES**

It is difficult to believe Petitioner would have
entered a knowing and intelligent plea if he knew his
sentence would be life in prison. Counsel either grossly
misadvised Petitioner of the applicable advisory guidelines
or should have requested a pre-plea PSR or PSR guidelines
analysis before Petitioner agreed to the plea.[10] Such a
request is reasonable with the type of plea Petitioner was
entering and the fact that a life sentence was to be
imposed. Waiving constitutional rights to be sentenced
under the advisory guidelines warrants review of what those
guidelines would be so that Petitioner could know the
benefit of the bargain in pleading guilty in exchange for
waiving his constitutional rights. See generally,
Santobello v. New York, 404 U.S. 257 (1971). (Where the
Supreme Court discussed contracts).

---

[10] Trial counsel for Petitioner sent a letter to
Petitioner's present post-conviction counsel in this matter
setting forth why he felt the life sentence was based on a
knowing and intelligent plea wherein all matters supposedly
were discussed by trial counsel with Petitioner including
the guidelines that would impose a life sentence.
Petitioner disputes the occurrence of such alleged
interchanges, the existence of which is a matter for
resolution by this Court.

The obvious and simple solution to resolving the disparity between a defendant's understanding of his plea agreement and the ultimate sentence handed down by the court, is to require the complete preparation of the PSR prior to the entering of the plea. This would promote a more open and honest system when dealing with plea negotiations, the Rule 11 hearing and sentencing. In turn, that defendant would have a clear understanding of the potential sentence he may receive.[11] Using this procedure, a defendant then could enter into a true "knowing and voluntary" plea.[12]

In United States v. Alvarez-Quiroga, 901 F.2d 1433 (7th Cir. 1990), the Seventh Circuit suggested that the district courts defer taking guilty pleas until a presentence report has been prepared and discussed with the defendant. Certainly, this would avoid some of the conflicts that are represented in most, if not all, cases concerning the plea and guidelines. Additionally, the defendant would be aware of a probable sentence not merely

---

[11] Even if that range is subject to further review based on objections to the PSR the information is reality oriented and helpful to entering a knowing and intelligent plea.

[12] Local rule LR72.1 seems to implicate the possibility that a pre plea PSR can be ordered by a Magistrate when a defendant signifies the desire to plead guilty.

41

a possible sentence, which more likely than not is not reflective of the defendant's understanding of the plea agreement and its relationship to sentencing. Furthermore, this practice is permissible under Rule 11(e)(1)(B) of the Federal Rules of Criminal Procedure.

In United States v. Day, 969 F.2d 39 (3rd Cir. 1992), the Third Circuit, in determining whether the appellant's trial attorney's representation during plea negotiations was deficient, stated that

> "[b]ecause the Sentencing Guidelines have become a critical, and in many cases, dominant facet of federal criminal proceedings, we can say, however, that familiarity with the structure and basic content of the guidelines . . . has become a necessity for counsel who seek to give effective representation."

This effectively continues, even in a post Booker world, based on Petitioner's plea and despite the courts 3553 discussions. It follows that not only must counsel be familiar with the guidelines and their applicability, but counsel must be fully apprised of the government's case in order to give effective representation. The Court in Day also stated that "...a defendant has the right to make a reasonably informed decision whether to accept a plea

offer."[13]    And, that *"[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty."*[14]

Procedures dealing with plea agreements are also covered in the Policy Statements of the Guidelines Manual at Chapter Six, Part B.    At the very outset, the Introductory Commentary to Part B states, in part,:

> *"Policy Statements governing the acceptance of plea agreements under Rule 11(e)(1), Fed.R.Crim.P. are intended to ensure that plea negotiation practices:*
>
> *(1)    promote the statutory purposes of sentencing prescribed in 18 U.S.C. '3553(a); and*
>
> *(2)    do not perpetuate unwarranted sentencing disparity."*

The United States Sentencing Commission amended the commentary to U.S.S.G. '6B1.2 by inserting the following:

> *"The    Commission    encourages    the    prosecuting*
>
> *attorney prior to the entry of a guilty plea or*
>
> *nolo contendere plea under Rule 11 of the Federal*
>
> *Rules of Criminal Procedure to disclose to the*

---

[13]    United States v. Day, 969 F.2d 39 at 43, citing Hill v. Lockhart, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed.2d 309 (1948).

[14]    United States v. Day, 969 F.2d 39 at 43, citing, 605 A.2d 103 (Md. 1992).

43

*defendant the facts and circumstances of the offense and offender characteristics, then known to the prosecuting attorney, that are relevant to the application of the Sentencing Guidelines."*
(Emphasis Added)

The Commission, in offering a reason for above referenced amendment, stated: *"[t]his amendment adds commentary to this policy statement recommending that the prosecuting attorney disclose to the defendant the facts and circumstances of the offense and offender characteristics then known to the prosecuting attorney that are relevant to the application of the guidelines **in order to encourage plea negotiations that realistically reflect probable outcomes.***"[15] With a plea agreement that contains mandatory terms restricting use of a Supreme Court precedent, and a statute, a pre plea PSR was warranted.

## ISSUE IV

### COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A NOTICE OF APPEAL OR AN APPEAL.

Counsel for Petitioner filed objections to the presentence report. However, he failed to appeal or file a notice of appeal.

---

[15] Federal Sentencing Guideline Manual, 2007 Edition, Appendix C, Amendment 495 (1994).

Petitioner acknowledges that his plea agreement contained a waiver of any appellate rights to a sentence outside the scope of the advisory guidelines, however, it is clear that Petitioner was not advised that the guidelines would result in a life sentence, as such, a Notice of Appeal should have been filed. As far as Petitioner is concerned the sentence that was imposed is outside the advisory guideline range he felt was applicable or was the basis for his plea.

Not all waivers of appeal deny access to the Court of Appeals. Under the Eleventh Circuit Court of Appeals holding in Martin v. U.S., 81 F.3d 1083 (11th Cir. 1996), under the Federal Sentencing Guidelines a defendant has a right to directly appeal his sentence even if he pleaded guilty. Moreover, an attorney's failure to file an appeal, after being requested to do so by the defendant, prejudices the defendant and constitutes ineffective assistance of counsel, even if the defendant pleaded guilty. Martin, 81 F.3d at 1084.

Even if counsel was not an appellate attorney he should have filed a notice of appeal. Even if there was a waiver, with questions and objections applied to the PSR and the severity of the sentence counsel, in the exercise of caution and due diligence, should have filed at least a

notice of appeal to allow adequate time to digest the severity of the sentence and other relevant issues. The notice could be withdrawn at a later time or new counsel brought in to assist with the appeal. At the very least filing a notice of appeal would give counsel time to address the matter with Petitioner in writing and get a signed waiver of appeal avoiding conflicts of ineffective assistance all together. The life sentence was clearly unreasonable.

Petitioner states he consulted with his attorney about requesting an appeal, which would have been his only avenue for relief from such a severe sentence. Petitioner's counsel advised against an appeal, but never advised Petitioner as to why such an appeal would not be an effective tool to at least challenge the objections made that Petitioner could claim placed him outside the correct advisory guidelines range. The advisory guidelines were not set in stone based on the objections filed by Petitioner's counsel. The guidelines the Court used for sentencing were subject to objection and further review.

This ineffectiveness by trial counsel is enhanced by the fact that several questions arose as to the application of the guidelines.

## ISSUE V

**COUNSEL WAS INEFFECTIVE IN FAILING TO ARGUE OR APPEAL, 1) THE GROUPING OF CLOSELY RELATED COUNTS, 2) THE APPLICATION OF U.S.S.G. 4B1.5 AFTER THE GUIDELINES HAD BEEN CALCULATED AND 3) THE PROPER APPLICATION OF 3E1.1 RESULTING IN CONSTITUTIONAL VIOLATION UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

## 1.  Grouping of Offenses

The guidelines specifically state that after all calculations are complete, in relationship to the guidelines, that the maximum guideline level would be Offense Level 43. (See Chapter 5 Part A, Commentary Note 2 stating that a "total offense level of more than 43 is treated as an offense level of 43). U.S.S.G. § 3D1.2 discusses the multiple count grouping requirements. Part (d) states "when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity or substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." Offenses not specifically covered by this grouping analysis were originally identified as those classified in 2G1.1 and 2G2.1.

U.S.S.G. 2G2.2 discusses trafficking and material involved in sexual exploitation of a minor. Cross-reference

Section (c)(1) states "that if the events involve causing, transporting, permitting or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of promoting or producing a visual depiction of such conduct then apply 2G2.1." This is applicable if the offense level is greater under 2G2.1 versus 2G2.2.

Effective November 1, 2001, the Commission amended 3D1.2(d) to include sections 2G2.2 and 2G2.4 as groupable offenses, thereby requiring grouping of multiple counts of child pornography distribution, receipt, and possession. The fact that crimes involve the same victims is an indication that they should be grouped together. *See* United States v. Nedd, 262 F.3d 85 (1st Cir. 2001) (holding that each of the defendant's threats to a family had the same exact victims and therefore should have been grouped); United States v. Norman, 951 F.2d 1182 (10th Cir. 1991) (hoping to "bring grief" to the suitor of his ex-wife, defendant twice falsely claimed that suitor was carrying explosives aboard a plane; the court held that the suitor was the victim, rejecting the argument that the crew and the passengers of different flights were the victims).

In the instant case, there were two victims, individually being used to create multiple videos. The fact

that crimes involve the same victims is an indication that they should be grouped together. Since this case involves a groupable offense of 2G2.2 the question turns on whether the cross-reference of 2G2.2 implicates that each video made would be classified as an individual group of offenses. U.S.S.G. 2G2.1 states that sexual exploitation of a minor for the production of sexually explicit visual or print material is a basis for the offense guidelines. However, since the guideline involves two victims with the same aggregate harm for each victim individually, according to U.S.S.G. § 2G2.1 Application Note 5 "for the purposes of Chapter 3, Part D (multiple counts), each minor exploited is to be treated as a separate minor. Consequently, multiple counts involving the exploitation of different minors are not to be grouped together under 3D1.2." Subsection (d)(1) directs that "if the relevant conduct of an offense of conviction includes more than one minor being exploited, whether it is specifically cited in the count of conviction or not, each such minor shall be treated as if contained in a separate count of conviction."

This implicates that each victim should be included in groups of closely related counts but that each count not related to a new victim would not be grouped. This is reinforced by Application Note 6 which suggests that an

upward departure may be warranted if the offense involved more than ten minors. Additionally, Special Instruction (d) states that "if the offense involved the exploitation of more than one minor, Chapter 3, Part D, Multiple Counts shall be applied as if the exploitation of each minor had been contained in a separate count of conviction." This does not alleviate the grouping rules as they relate to closely related counts applicable to each victim. The issue of grouping is they are appropriate for appellate review, notwithstanding the plea agreement.

Even if the grouping was accurate clearly the court should have considered the issue in light of all 3553 factors including disparity among similarly situated defendants.

## 2. U.S.S.G. 4B1.5

Paragraph 110 of the Presentence Report states that §4B1.5 for repeat and dangerous sex offenders increases the offense level by 5 points. In this case, the five (5) points were added to the combined adjusted offense level after grouping. Level 43 with 3 levels deducted for acceptance of responsibility left a total offense level of 40. With a guideline range of 38 plus 2 levels for grouping, if grouping was done correctly and with proper 3553 considerations, the offense level would be 40 adding

4B1.5 leaving level 45 minus 3 levels for 3E1.1 which then leaves level 42. Using this 4B1.5 section after all other adjustments did not give Petitioner credit for his acceptance of responsibility and therefore defeats the purpose of the guidelines pursuant to §3E1.1 and Chapter 5 part A. This also constitutes cruel and unusual punishment as it increases the punishment without acceptance of responsibility credit after the guidelines are calculated.

Petitioner states that he should have received an offense level of 43 after all calculations were imposed on the offense level, whether or not the grouping is correct, pursuant to §4B1.5. Pursuant to Chapter 5 part A the total offense level would be reduced to Level 43. With three points off for acceptance of responsibility, the base offense level would be 40 and the guidelines would be 292 to 365 months, Criminal History Category I. (At the very least with a different grouping analysis level 42).

Such circumstances render part of the advisory guidelines meaningless and a conflict with the stated goals and purpose of 3E1.1 mitigation, making this issue appropriate for appellate review, not withstanding the plea agreement.

## 3. 3E1.1 Acceptance of Responsibility

It appears from the Presentence Report that once the Base Offense Level was determined at 43 and three points were deducted for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a)(b), the base offense level of 40 was applied. The Presentence Report in Paragraph 110 then applied, subsequent to the above referenced adjustments, a five level increase for § 4B1.5 under repeat and dangerous sex offenders against minors.

U.S.S.G. § 4B1.5 does not indicate that the application of this guideline enhancement is to be applied post acceptance of responsibility. In fact, this section of the guidelines is similar to that of the Career Offender Enhancement Penalty Provision section which requires that all of the guideline adjustments be determined before the acceptance of responsibility credit is given in order to ensure that credit for acceptance of responsibility is meaningful. (*See* U.S.S.G. § 4B1.5(b)(1) "the offense level shall be five plus the offense level determined under Chapters 2 and 3. However, if the resulting offense level is less than 22, the offense level shall be Level 22, decreased by the number of levels corresponding to any applicable adjustments for 3E1.1.")

In addition to this consideration, Petitioner states that even if the guidelines are greater than Level 43, Petitioner should be given a base offense level of 43 before the acceptance of responsibility credit is given or the acceptance of responsibility credit is meaningless. Such is supported by 18 U.S.C. § 3553 factors and Chapter 5 of the Federal Sentencing Guidelines. Chapter 5 specifically states that the highest base offense level is 43, however, by achieving that level through the acceptance of responsibility, the acceptance of responsibility credit is not valued.

U.S.S.G. § 3E1.1 does not clarify the impact of this conflict on the sentence to be imposed particularly in cases where a plea bargain is entered. This conflict in the guidelines is subject to additional review pursuant to 18 U.S.C. § 3553. This was not considered or raised by trial counsel and is critical to Petitioner as the outcome would have been different had this matter been reviewed at sentencing and/or on appeal. The application of § 3E1.1 in this case is an issue appropriate for appellate review, notwithstanding the plea agreement.

At the very least some of these factors could be considered pursuant to 18 U.S.C. 3553 factors as the sentence in this case was clearly unreasonable.

## ISSUE VII

### COUNSEL FAILED TO OBJECT TO THE COURT'S 3553 ANALYSIS IN THAT IT WAS NOT SPECIFIC AND DID NOT ENCOMPASS SECTION (a)(6).

This Court discussed some of the 18 U.S.C. 3553 factors at sentencing. Counsel failed to respond or address the Court's findings which are not specific enough or rebuttable. 18 U.S.C. § 3553(a)(6) states that the Court should sentence a defendant consistent with avoiding "unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct."

Clearly the sentence that was imposed in this case was unreasonable in relationship to other defendants in similar situations. Petitioner is a first offender and though his offense went on for an apparent lengthy period of time, this did not eliminate the Court's consideration of mitigating factors that would be applied to other defendants similarly situated to Petitioner.

18 U.S.C. § 3553(a)(6) was intended to be read as a whole with the statute and the Federal Sentencing Guidelines. In doing so, it was clear that the entire purpose and scope of the Guidelines themselves, as well as the statute, was to ensure that there would be limited disparity between similarly situated defendants.

Petitioner's case, and the sentence he received, does not comport to other similarly situated defendants and constitutes cruel and unusual punishment.

In United States v. Forrest, 429 F.3d 73, 77 (4th Cir. 2005), a jury convicted the defendant of two counts of sexually exploiting a minor for the purpose of producing child pornography in violation of 18 U.S.C. § 2251(a) and two counts of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). The guideline range was 108-135 months. The defendant received 120 months, the mandatory minimum, a sentence which was 1/10 as long as that received by Petitioner. In United States v. Seabrooke, 2004 U.S. App. LEXIS 13828 (4th Cir. 2004) the defendant pled guilty to using a minor to engage in sexually explicit conduct for production of visual depictions of such conduct, in violation of 18 U.S.C. § 2251(a) and received 144 months, a sentence which was 1/10 as long as that received by Petitioner.

In United States v. Gann, 160 Fed. Appx. 466, 468 (6th Cir. 2005), sometime in 1998 or 1999, Gann began sexually abusing his eldest daughter, who was then twelve or thirteen years old and living with her father. The abuse continued until she was sixteen years old. Gann forced the victim to lie down on the couch and close her eyes. He then

videotaped her as he undressed and fondled her. He coerced her cooperation by threatening to videotape her younger half-sisters if she refused. During July of 2001, Gann compelled the victim into making a second videotape, again coercing her by threatening to videotape her half-sisters instead. Gann provided lingerie and sex toys, which the victim used to perform sexual acts in front of the video camera. In June of 2002, Gann took sexually explicit, nude photographs of his middle daughter, who was ten years old at the time. On July 3, 2002, the older daughter got into an argument with her father regarding his attempts to get her to make a third video. During a search of Gann's home, GPD officers found videotapes, photographs, compact discs, and video and computer equipment. On Gann's computer hard drive or compact discs, police found the second video and photographs of his daughters, along with twelve pornographic photographs of known children. One directory on Gann's computer contained over 1500 pornographic files. Of the hundreds of sexually explicit images found on Gann's computer and compact discs, most of them were of children. His sentence was 210 months, which was 1/6 as long as that received by Petitioner.

In United States v. Bell, 5F.3d 64 (4th Cir. 1993), the defendant's conduct involved the molestation of several

family members for the purpose of making visual depictions of that conduct. Bell had prior convictions. Id. ("Based on Bell's prior convictions for promotion and distribution of child pornography and for sexual abuse of a child, his Criminal History Category was III"). Clearly the victims in Bell, including his daughter, suffered (1) humiliating, degrading and painful activities in creating the tapes for Mr. Bell, (2) the events took place over a period of time, (3) the voyeuristic and touching behavior of watching or producing these videotapes in Bell is engaging in illegal sexual activity with the victims, (4) the psychological abuse was ongoing to these victims and is a lifelong condition, and (5) psychological damage and the pattern of psychological and sexual abuse in any case where family members are engaged in sexual activities for the depiction of a video are particularly devastating in the long term. The Court remanded Bell's case from a downward departure of 12-months sentence to a Guideline range of 87 to 108 months. Clearly Bell was a long term, repetitive offender whose conduct could be classified as extreme and outrageous, yet his sentence was 1/10 as long as that received by Petitioner.

In United States v. Mugan, 441 F.3d 622, 625-627 (8th Cir. 2006), Mugan used a digital camera to take sexually

explicit photographs of himself having intercourse with his 13 year old daughter. The district court assigned Mugan a base offense level of 27 and increased it by four levels due to the age of the victim and her relationship to Mugan. The district court also imposed a two level enhancement for obstruction of justice. His adjusted offense level of 33, together with his criminal history category III, resulted in a sentencing range of 168 to 210 months. The district court departed upward two levels on the grounds that Mugan's administration of sleeping medication to his daughter to facilitate the production of the sexually explicit photographs was a factor not accounted for in the sentencing guidelines and that Mugan's criminal history failed to reflect the seriousness of his past conduct. The resulting total offense level of 35 placed Mugan in a range of 210 to 262 months imprisonment, and the district court sentenced him to the statutory maximum of 240 months in prison, a sentence which was 1/6 as long as that received by Petitioner.

In United States v. Granger, 117 Fed. Appx. 247, 248 (4th Cir. 2004), Michael Wayne Granger pled guilty to transporting and shipping images of child pornography contained on computer diskettes and stored on the hard drive of Granger's computer. See 18 U.S.C.A. § 2252A(a)(1)

(West Supp. 2004). Investigation revealed that several of these images depicted Granger engaged in sexual activity with his daughter, then 6 years old, and stepdaughter, who was 7. The district court imposed a sentence of 180 months (15 years), followed by a three-year term of supervised release, which was 1/6 of that received by Petitioner.

The details of every one of the cases cited above reflect lengthy abuse, multiple abuses, disturbing abuse, video abuse, and psychological abuse by defendants that is far worse than Petitioner's case, including defendants with substantial previous convictions.

The guidelines for any departure in Petitioner's case must therefore, also be guided by 18 U.S.C. § 3553(a)(6), the factor regarding similarly situated defendants, in order to be reasonable. This analysis was never reviewed by the Court or trial counsel at sentencing and is appropriate for appellate review. Once 3553 factors were discussed at sentencing by the Court, notwithstanding other errors, counsel should have objected and presented relevant statutory and guideline information on these issues.

In addition to the above, the sentence that was imposed amounted to cruel and unusual punishment in violation of Petitioner's Eighth Amendment rights. When confronted with an Eighth Amendment argument the Court

should make "a threshold comparison of the crime committed and the sentence imposed." *See* Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680 (1991). It may be helpful to compare sentences in the same or different jurisdictions to avoid Eighth Amendment conflicts. Salem v. Helm, 463 U.S.C. 3553 (a)(6) seems to reinforce this purpose. The entire statute must be considered. In Petitioner's case it was not considered and trial counsel failed to so object.

## ISSUE VI

### THE INDICTMENT WAS DEFECTIVE AND COUNSEL WAS INEFFECTIVE FOR FAILING TO CHALLENGE THE INDICTMENT.

This issue is related to counsel's ineffective assistance for failing to recognize and challenge the many errors contained within the indictment handed down against Petitioner. The general rule in all criminal cases is that the accused has a constitutional right to an indictment that puts him on notice of the case that the prosecution will present against him at trial. Thompson v. Nagle, 118 F.3d 1442 (11th Cir. 1997). The sufficiency of a criminal indictment is determined on its face; the elements of the offense(s) intended to be charged must be stated for an indictment to be deemed valid. U.S. v. Sharpe, 438 F.3d 1257 (11th Cir. 2006). Moreover, the Sixth Amendment of the Constitution mandates that an accused shall enjoy the right

to be informed of the nature and cause of the accusation against him, and also requires that the offense(s) be sufficiently described in order to enable the defendant to prepare his defense for trial. Vasquez v. U.S., 229 F.2d 288 (5th Cir. 1956).

Here, Counts 2 through 11 merely list ten different dates upon which criminal activity was alleged to have been conducted by Petitioner. None of these Counts or dates detail the location of the alleged criminal activity, whom Petitioner was alleged to have engaged in illegal activity with, exactly what illegal activity is alleged to have occurred on each date, and whether the same minor is alleged to have been involved on multiple dates.

Moreover, Counts 13 through 22 also only list ten different dates upon which criminal activity was alleged to have been conducted by Petitioner. None of these Counts detail the location of the alleged criminal activity, whom Petitioner was alleged to have engaged in the illegal activity with, exactly what illegal activity is alleged to have occurred on each date, and whether the same minor is alleged to have been involved on multiple dates.

Here, under the Court's ruling in Vasquez, there is no possible way that it can be said that Petitioner was ever informed of the nature and cause of the accusation against

him, and that the offenses were sufficiently described in order to give Petitioner the ability to prepare a defense for trial. In none of the twenty Counts referenced above was Petitioner ever put on notice with regard to the location of the alleged criminal activity, whom Petitioner was alleged to have engaged in the illegal activity with, exactly what illegal activity was alleged to have occurred on each date, and whether the same minor was alleged to have been involved on multiple dates.

Since, on its face, the criminal indictment handed down against Petitioner failed to put him on notice of the case that the prosecution would present against him at trial, Petitioner's constitutional rights were violated. Furthermore, in as much as counsel for Petitioner failed to recognize and challenge the many errors contained within the indictment, such error constitutes ineffective assistance of counsel.

An indictment need only charge the essential elements of the offense, permitting the accused to prepare a defense and protecting against double jeopardy. United States v. Chappell, 6 F.3d 1095, 1099 (5th Cir. 1993). The overt acts portion of the indictment may be considered in judging the sufficiency of an indictment. United States v. Salisbury, 983 F.2d 1369, 1374 (6th Cir. 1993). "[T]he

indictment should be read as a whole and interpreted in a common-sense manner...Courts...do not insist that any particular word or phrase be used in stating an essential element." United States v. Stoner, 98 F.3d 527, 531 (10th Cir. 1996), *quoting* United States v. Kilpatrick, 821 F.3d 1456, 1463 (10th Cir. 1987). *See also* Wong Tai v. United States, 273 U.S. 77, 82 (1927) (Indictment, both in respect to the conspiracy and the overt acts, sufficiently advised the defendant of the nature and cause of the accusation, with requisite particularity.)

Petitioner further states he is not guilty of Count 12 of the indictment and the indictment fails to put Petitioner on notice of the facts supporting such a charge.

WHEREFORE, Petitioner prays this Honorable Court will grant the Habeas Petition to:

1.  Allow Petitioner to be resentenced consistent with 18 U.S.C. § 3553 and his understanding of the plea agreement.

2.  Allow the judgment to be reissued so an appeal of the aforementioned issues can be presented.

3.   Petitioner believes however, that due to the errors
     presented here his conviction and sentence must be
     overturned.

                              Respectfully submitted,


                              Marcia G. Shein
                              Counsel for Petitioner
                              Georgia Bar No. 639820
                              Federal Bar No. 53667
                              2392 North Decatur Road
                              Decatur, Georgia 30033
                              (404) 633-3797 (Phone)
                              (404) 633-7980 (Fax)
                              Marcia@MSheinlaw.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ALABAMA

### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **2:05-CR–00523-LSC-TMP** |
| | ) | |
| FRANK C. BAIRD, II | ) | |

### PLEA AGREEMENT, CONDITIONS, AND UNDERSTANDINGS

The United States of America, the defendant and the defendant's attorney

each hereby acknowledge the following to be the plea agreement between the

defendant and the United States and the conditions and understandings that apply

to the agreement:

I.    PLEA AGREEMENT:  The United States and the defendant hereby AGREE

to the following:

    (A)   Plea:  The defendant will plead guilty to Counts One through Five,
         and Twelve through Twenty-Three in the Second Superseding
         Indictment in the above styled case.

         (1) By pleading guilty to Count Twenty-Three of the Second
         Superseding Indictment, the defendant agrees to the following
         forfeiture:

                (a)  Defendant hereby forfeits all his right, title and interest in
                the following property:
                        Certain real property located at 105 Fifth Street, W,
                        Warrior, Alabama, 35180, and more particularly



EXHIBIT

A

described as follows:

> Parcel ID: 3-13-3-3-5.000-RR, Legal Description:
> That part of NE 1/4 of SW 1/4 of Section
> 13, Township 14, Range 3 West, located in
> the town of Warrior commencing at a point
> 110 feet more or less from the NW corner of
> Fifth and Main Streets, running along the
> north side of Fifth Street 64 feet, thence
> north 100 feet, thence east 64 feet, thence
> south to the point of beginning, buildings
> included.

The defendant acknowledges that said real property
serves as a substitute asset for any real or personal property that
may be subject to forfeiture for its use or intended use to
commit or promote the commission of the offenses to which the
defendant agrees to plead guilty by the terms of this Plea
Agreement.

(b) Defendant hereby agrees to the entry of an order of
forfeiture against said real property, pursuant to Fed. R. Crim.
P. 32.2(b)(1), upon his plea of guilty to said offenses alleged in
the Second Superseding Indictment and reflected by this Plea
Agreement. For purposes of entering an order of forfeiture, the
defendant acknowledges that a nexus exists between certain
other property and the criminal offenses to which the defendant
is pleading guilty.

(c) In the event that any claim is made by third parties to the
real property identified for forfeiture at paragraph (a) above,
the defendant agrees that the United States may forfeit any
other property of the defendant equal in value to that amount
successfully claimed by said third parties in ancillary
proceedings in this action.

(d) Defendant agrees that he will fully cooperate with the
government by taking whatever steps are necessary to pass

2

clear title to the United States of the named real property subject to forfeiture, identified in paragraph (a) above, including, but not limited to, completing any legal documents required for the transfer of said real property to the United States, and taking whatever steps are necessary to ensure that said real property is not sold, disbursed, wasted, destroyed or otherwise made unavailable for forfeiture to the United States of America.

(e) Defendant understands and acknowledges that the government is relying upon defendant's representation in entering into this plea agreement. If defendant's representations are false or inaccurate, the government may pursue any and all forfeiture remedies available at law or equity on the basis of the violations of 18 U.S.C. §§ 2252A(a)(5)(B), 2251(a), 2243(b), and 2252A(a)(1) covered by this plea agreement.

(f) The defendant agrees to waive any Double Jeopardy challenges that he may have to the entry of a Forfeiture Order before sentencing.

(g) The defendant agrees to waive any claims, defenses or challenges arising under the Excessive Fines Clause of the Eighth Amendment resulting from the forfeiture imposed as a result of this indictment and/or any pending or completed administrative or civil forfeiture actions based upon the course of conduct that provides the factual basis for the forfeiture.

(h) The defendant hereby waives the requirements of Fed. R. Crim. P. 43(a) with respect to the imposition of any forfeiture sanction carried out in accordance with this Plea Agreement, and further agrees to not contest or challenge in any manner (including direct appeal, habeas corpus, or any other means) such forfeitures on any grounds, including that the forfeiture constitutes double jeopardy, or an excessive fine or punishment.

3

(B)   The United States will move to dismiss Counts Six through Eleven.

(C)   Recommendation:  Pursuant to Rule 11(c)(1)(B), Fed.R.Crim.P., and upon the Court's acceptance of the aforesaid plea and entry of judgment on the same, the United States will recommend as follows:

    (1)   The defendant be sentenced at the low end of the advisory guidelines range. The defendant agrees and understands that the guideline range will be determined by the court and may be different from that calculated by defense counsel, the prosecutor, or the probation office.

    (2)  The defendant be placed on supervised release for a period to be determined by the court following completion of his prison term with following conditions of supervised release: That the defendant shall not have any unsupervised, one-to-one contact with any children under the age of eighteen; that the defendant shall not engage in any occupation, employment, or volunteer activities which would place him in a position of trust with children under the age of eighteen; that the defendant register and comply with any then applicable local, state or federal laws dealing with the registration or monitoring of individuals convicted of these offenses; that the defendant not subscribe to or otherwise utilize any online computer services or computer bulletin boards other than those which are connected directly with his employment and used by him for the benefit of his employer;  that the defendant provide the probation officer with complete access to any computer and computer related equipment which the defendant utilizes; and that the defendant allow the probation officer complete access to any computers, computer media, photographs or videos in his possession or under his control.

       Should the defendant ask the court to impose a sentence below the advisory guideline range on any basis, including but not limited to factors in 18 U.S.C.

4

3553, the government will consider this agreement null and void. Should the government learn that the defendant has sexually abused or assaulted any minor other than those included in the counts of conviction or committed any other crime of violence, this agreement will be considered by the government to be null and void.

(D)   Factual Basis: The following is a true and correct summary of the factual basis of the offense to which defendant is pleading guilty. The defendant agrees that the court may use these facts for sentencing purposes.

In or about September, 2005, Frank C. Baird, II, was in possession of multiple images of minor children, under the age of 18, engaged in sexually explicit conduct, within the meaning of Title 18, United States Code, Section 2256, at the time Deputies from the Jefferson County Sheriff's Office executed a search warrant at Baird's place of business at 415 Main Street, Warrior, Alabama. Possession was on or about September 23, 2005.

Between May 1, 2002, and April 7, 2003, Frank C. Baird, II, produced multiple images of two minor children, under the age of 18, engaged in sexually explicit conduct, and used the United States Mails to ship the images to Photoworks, Inc., located in Seattle, Washington, for processing. Baird had the printed photographs returned to Post Office Box 8, Warrior, Alabama, and other addresses in Alabama from Photoworks, Inc., via the United States Mails. Production, transportation in interstate commerce, and mailing of the above described images was on or about 5/1/02, 8/19/02, 3/17/03, and 4/7/03.

In or about June, 2003, Baird traveled to Atlanta, Georgia, from Warrior, Alabama, for purposes of participating in sexual activity with a minor, under the age of 18, and did, in fact, have sexual intercourse with this minor in Atlanta, Georgia. Baird paid the minor to have sexual intercourse with him.

Between May 1, 2002, and March 28, 2005, Baird used the United States Mails to ship images containing child pornography to Photoworks, Inc., located in Seattle, Washington, for processing. Baird had the printed photographs containing child pornography returned to Post Office Box 8, Warrior, Alabama, and other addresses in Alabama from Photoworks, Inc., via the United States Mails. The

5

mailing, shipping, and transportation of the images containing child pornography occurred on or about 5/1/02, 8/19/02, 3/17/03, 4/7/03, 6/13/03, 8/4/03, 9/5/03, 2/12/04, 5/28/04, and 3/28/05.

> **The defendant hereby agrees and stipulates to the accuracy of the above factual basis. Defendant agrees that the information above may be used for sentencing purposes and waives any right he may have for a jury determination of such facts.**

**DEFENDANT'S NAME**

(E)   Assessment: The defendant will bring to the sentencing hearing, a money order or cashier's check in an amount equal to $100.00 for each count of conviction, for a total of **$1,700.00 ,** payable to the "Clerk, United States District Court" to pay the special assessment required by Title 18, United States Code, Section 3013. The defendant will pay the assessment to the clerk of the court immediately upon sentencing.

II.   CONDITIONS AND UNDERSTANDINGS: The following conditions and understandings apply to the plea agreement set out above:

A.   POSSIBLE SENTENCES AND THE GUIDELINES

(1) Maximum Possible Sentences: The defendant is aware of the maximum possible punishments under each count. The defendant is aware that a sentence could include imprisonment, supervised release terms following imprisonment, fines, assessments, restitution, and other costs and

6

losses.

(2)     Special Assessment Fees:  The law requires that Special

Assessment fees be imposed.

(3)     Restitution:  The Court must order restitution in cases

involving an identifiable victim.

(4)     Guidelines:  Counsel has explained to the defendant, that in

light of the United States Supreme Court's recent decision in United States

v. Booker, the federal sentencing guidelines are advisory in nature.

Sentencing is in the court's discretion and is no longer required to be within

the guideline range.  The defendant agrees that, pursuant to this agreement,

the court may use facts it finds by a preponderance of the evidence to reach

an advisory guideline range and defendant explicitly waives any right to

have those facts found by a jury beyond a reasonable doubt.

The defendant waives his right to appeal his conviction and

sentence, on both direct and collateral appeal, so long as that sentence is

within the advisory guideline range, as that range is determined by the

Court.  The defendant understands and agrees that this is a binding waiver,

which prevents him from filing an appeal regarding the length or imposition

of sentence.

7

(5)     Non-binding: It is the Court's duty to impose sentence. The

Court is not a party to the above plea agreement. Any sentence

recommendation by the United States does not bind the Court, and the Court

may impose a more severe or less severe sentence than that recommended.

(6)     Sentencing Information: The United States may make any facts

or evidence it deems relevant to sentencing known to the Court. This

includes the fact of any obstructive conduct or new violations of law

committed by the defendant after entry of a guilty plea.

B.      WITHDRAWAL OF GUILTY PLEA NOT ALLOWED

If the Court decides not to give the recommended sentence, or decides

that the recommended sentence is not within the Guideline range, the

defendant may not withdraw the plea of guilty.

C.      FAMILIARITY WITH CHARGES

_____The defendant has read and understands the indictment, and has

discussed the charges and possible defenses with counsel. The defendant is

fully aware of the elements of each count.

D.      ACKNOWLEDGMENT OF GUILT

_____The defendant is pleading guilty to the charge described above

because the defendant is in fact guilty. Should the defendant move the court

8

to accept the plea of guilty under the provisions of North Carolina v. Alford,
400 U.S. 25 (1970), or tender a plea of nolo contendere, the plea agreement
described above will be null and void and the United States will not be
bound by any agreement, understanding, provision, or stipulation, express
or implied in this document.

E.   WAIVER OF TRIAL RIGHTS

The defendant, by pleading guilty, waives any and all motions
(whether pending or anticipated), defenses, objections, or requests which
have been made or which could have been made in this case. The defendant
also waives the right to trial by a jury (or by a judge if the defendant elected
to be tried by a judge alone) and waives any right that may exist to have any
factors used for sentencing found beyond a reasonable doubt by a jury. At
any such trial, the defendant would have the right to assistance of counsel,
to confront and cross-examine the witnesses against the defendant, to
present evidence on the defendant's behalf, to compel the attendance of
witnesses for the defense, and to testify or refuse to testify. The United
States would bear the burden of proof beyond a reasonable doubt. The
defendant would be presumed innocent and could only be convicted and
sentenced if a jury of twelve people (or a judge if the defendant elects to be

9

tried by a judge) unanimously found the defendant to be guilty beyond a reasonable doubt. The defendant would have the right to appeal a guilty verdict and sentence. All these rights and protections are hereby waived.

**F.** **WAIVER OF DIRECT AND COLLATERAL APPEAL RIGHTS**

**In consideration of the Government's recommended disposition, the defendant hereby waives and gives up the right to appeal (1) my conviction in this case, (2) any sentence or restitution the court might impose upon me except for a sentence that exceeds the statutory maximum, (3) the right to challenge any sentence so imposed or the manner in which the sentence was determined in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255, and (4) any fines and special assessments imposed, subject to the following limitations:**

**Any punishment that constitutes an upward departure from the advisory guideline sentencing range, as determined by the court. I further acknowledge that before giving up these rights, I discussed the advisory nature of the Federal Sentencing Guidelines and their application to my case with my attorney,**

10

who explained them and answered all of my questions to my satisfaction. I hereby place my signature on the line directly below to signify that I fully understand the foregoing paragraphs, and that I am knowingly and voluntarily giving up the appeal and sentencing rights stated.

**DEFENDANT**

**COUNSEL**

## G.    DEFENDANT'S UNDERSTANDING

The defendant has read and understands the provisions of this agreement consisting of Fifteen pages. He has discussed the case and constitutional and other rights with his lawyer and is satisfied with the lawyer's representation in this case. The defendant understands that by pleading guilty, all right to continue to plead not guilty, to a trial by jury, to the assistance of counsel at that trial, to confront, cross-examine, or compel the attendance of witnesses, to present evidence in defendant's behalf, to maintain privileges against self-incrimination and to the presumption of

11

innocence, and to file a direct or collateral appeal of conviction and

sentence except in the limited circumstances enumerated above is waived.

The defendant agrees to enter a plea as indicated above on the terms and

conditions set forth herein.

## H.   COUNSEL

The defendant has discussed this case at length with defendant's

counsel. The defendant is satisfied with counsel's investigation of the case,

exploration of possible defenses, advice and other representation. The

defendant is satisfied that counsel has explored all relevant witnesses and

potential motions on defendant's behalf and has represented defendant in an

effective fashion.

## I.   NON-RELIANCE

Other than what is contained in this document, NO PROMISES OR

REPRESENTATIONS HAVE BEEN MADE TO THE DEFENDANT BY

THE PROSECUTOR, AGENTS, OFFICERS, OR BY ANYONE ELSE,

NOR HAVE ANY THREATS BEEN MADE OR FORCE USED, TO

INDUCE THE DEFENDANT TO PLEAD GUILTY.

The defendant is not relying on any representations from anyone

regarding length of sentence, conditions of service of sentence, possible

12

parole or release dates, or other conditions of incarceration including, but
not limited to, designation of facility and the type of facility to which a
designation may be made. This document represents the sole agreement and
understanding between the defendant and the United States.

J.      POST-SENTENCE ACTIONS

This document in no way limits any response by the United States to
post-sentencing actions, including appeals, motions to correct or review
sentences, or habeas corpus petitions.

K.      OTHER DISTRICTS AND JURISDICTIONS

This document DOES NOT BIND any other United States Attorney
in any other district, nor does it bind state or local authorities.

L.      FORFEITURE AND OTHER CIVIL OR ADMINISTRATIVE
        PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to
or limits any pending or prospective forfeiture or other civil or
administrative proceedings.

M.      TAX PROCEEDINGS

Unless otherwise specified herein, this document in no way applies to
or limits any pending or prospective proceedings related to the defendant's

13

tax liabilities, if any.

## N.    COMPETENCE

The defendant has not had any drugs, medication or alcohol within the past 48 hours except as stated hereafter, and is competent to enter the plea agreement stated above.

14

III.   ACKNOWLEDGMENTS

1.   I have READ this document, DISCUSSED it with my attorney, and
UNDERSTAND and AGREE with all its provisions both individually
and totally.

_____2.28.06_____                    _____
DATE                                 Defendant

2.   I have discussed this case with the defendant in detail and have
advised the defendant of the defendant's rights and all possible
defenses.  The defendant has conveyed to me that he understands this
document and consents to all its terms.  I believe the plea and
disposition set forth herein are appropriate under the facts of this
case.  I concur in the entry of the plea as indicated above and on the
terms and conditions set forth herein.

_____2.28.06_____                    _____
DATE                                 Counsel for Defendant

3.   I have reviewed this document and agree to its provisions.

                                     **ALICE H. MARTIN**
                                     United States Attorney

_____3/1/06_____                     _____
DATE                                 **E. VINCENT CARROLL**
                                     Assistant United States Attorney

15

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

UNITED STATE OF AMERICA      )
                                     )

V.                                    )     **Case NO. CR05-00523-LSC-TMP**
                                     )

FRANK C. BAIRD, II                 )
_____ )

## DEFENDANT'S OBJECTION TO THE PRESENTENCE REPORT

Comes now before the Court the Defendant Frank C. Baird, II, with his objection to the Presentence Report prepared by the United States Probation Office on May 19, 2006.

### OBJECTIONS

**Objection One.**

Page (3) of the Presentence Report.  Although not assigned an offense level, Defendant objects to the statement that he used "Lewis Golden" and "Frank Golden" as aliases. Defendant states he has never used these names.

**Objection Two.**

Page (7) Paragraph (12) of the Presentence Report.  Defendant objects to the statement that he transported JF#1 from Warrior, Alabama, to Atlanta, Georgia, in order to engage in sexual conduct with JF#1.  Defendant did not transport JF#1 to Georgia.  JF#1 was residing in Georgia (with her mother) at that time.  Defendant visited JF#1 there.

**Objection Three.**



Page (11) Paragraph (37) of the Presentence Report (Counts 4 and 15). Defendant objects to his conduct portrayed as sadistic or masochistic in nature. Defendant states the "bead" referred to in the report did not contain a *clip,* but rather slipped on and did not cause discomfort; and that, Defendant engaged in no behavior which could reasonably be categorized as sadistic or masochistic. Therefore, the offense level should be 0.

## Objection Four.

Page (13) Paragraph (48) of the Presentence Report (Counts 12 and 17). Defendant objects to this increase in computation of Sentencing Guidelines. Defendant asserts he did not transport a minor to engage in sexual explicit conduct for the purpose of producing a visual depiction of such conduct. Therefore, the base offense level is 24. Moreover, Defendant objects to the inclusion of this information because it is contrary to the plea agreement, extraneous, and not contained in the factual basis of the offense within the *Plea Agreement, Conditions and Understandings*, which was entered into with the U.S. Attorneys Office and filed on March 1, 2006.

## Objection Five.

Page (13) Paragraph (51) of the Presentence Report (Counts 12 and 17). Defendant objects to this increase in computation of Sentencing Guidelines. Defendant states that JF#1 was never in the care, custody or supervisory control of the Defendant. Therefore, the offense level is 0. Moreover, Defendant objects to the inclusion of this information because it is contrary to the plea agreement, extraneous, and not contained in the factual

2

basis of the offense within the *Plea Agreement, Conditions and Understandings*, which was entered into with the U.S. Attorneys Office and filed on March 1, 2006.

## Objection Six.

Page (14) Paragraph (64) of the Presentence Report (Count 19). Defendant objects to his conduct portrayed as sadistic or masochistic in nature. Defendant engaged in no behavior which could reasonably be categorized as sadistic or masochistic. Therefore, the offense level is 0.

## Objection Seven.

Page (16) Paragraph (75 & 81) of the Presentence Report (Count 21). Defendant objects to computation of Sentencing Guidelines for Paragraph 75 and 81 as duplicative (assessed twice for one count), and such computation is unreasonably punitive and is contrary to the spirit of the *Plea Agreement, Conditions and Understandings*, which was entered into with the U.S. Attorneys Office and filed on March 1, 2006.

## Objection Eight.

Page (18) Paragraph (107 & 109) of the Presentence Report. Defendant objects to computation of Sentencing Guidelines of the Combined Adjusted Offense Level as 43 and the Total Offense Level as 40 as including unwarranted enhancements (as previously stated herein).

## Objection Nine.

3

Page (19) Paragraph (110-111) of the Presentence Report (Count 20). Defendant objects

to computation of Sentencing Guidelines to Chapter Four Enhancements. Defendant

contends that §4B1.5 is aimed at punishing repeat convicted offenders and should not be

used as an enhancement in the instant case, since Defendant has no prior convictions and

that the entry of a guilty on the state charge arose from the same facts and circumstances,

and is contrary to the spirit of the *Plea Agreement, Conditions and Understandings,*

which was entered into with the U.S. Attorneys Office and filed on March 1, 2006.


**Objection Ten.**

Page (19-20) Paragraph (112-119) of the Presentence Report. Defendant objects to

inclusion of the information in the Presentence Report styled as *Offense Behavior Not*

*Part of Relevant Conduct.* Defendant objects to this information to the extent it is

extraneous and contrary to the spirit of the *Plea Agreement, Conditions and*

*Understandings,* which was entered into with the U.S. Attorneys Office and filed on

March 1, 2006. Moreover, Defendant asserts the factual summary within the *Plea*

*Agreement, Conditions and Understandings* is sufficient information for the sentencing

process.


**Objection Eleven.**

Page (24) Paragraph (138-140) of the Presentence Report regarding Defendant's financial

condition and ability to pay. Although not assigned an offense level, the Court may

utilize this information to assess fines. Defendant objects to the valuation of the real

4

property located at 315 Louisa Street, Warrior, Alabama as $84,100.00. Defendant's
states the value of this property is currently assessed at approximately $69,600.00.
Defendant objects to inclusion of the valuation of the farm equipment as $30,000.00.
Defendant claims that this equipment is valued at approximately $20,000.00, and that it is
secured by a loan of $14,000.00. Defendant disputes that he has ever received a valid
offer to purchase his farm for $2,000,000.00, by anyone. Defendant asserts that real
property that comprises the farm, for the duration of time in which it belonged to his
family, has been used for agricultural purposes only and is currently assessed at four
parcels aggregating approximately $311,500.00, less any applicable recorded judgment
liens. Defendant is uncertain as to the amount of farmland since the property remains
un-surveyed. Defendant again asserts the value of the of the real property located at 315
Louisa Street, Warrior, Alabama, as approximately $69,600.00, less a recorded mortgage
of $30,000.00 and any applicable recorded judgment liens. Defendant agrees and
acknowledges that the property is listed 'for sale' (315 Louisa Street, Warrior, Alabama)
at a price of $115,000.00 (through a realtor with a contract for 10% sales commission),
however, to date, Defendant has received no written offers (contracts) for the purchase
this property.

## Objection Twelve.

Page (25) Paragraph (145) of the Presentence Report regarding Statutory Provisions.
Defendant objects to the computation of this offense level as 43 (as previously stated
herein). Defendant has accepted responsibility for his conduct. The current

5

recommendation is contrary to the spirit of the *Plea Agreement, Conditions and*

*Understanding*s which was entered into with the U.S. Attorneys Office and filed on

March 1, 2006, and which calls for the United States to recommend to the Court "[t]he

defendant be sentenced at the low end of the advisory guidelines range."

**Objection Thirteen.**

Defendant objects, generally, to all computations contrary to the Sixth Amendment,

Blakely v. Washington, and U.S. v. Booker, 543 U.S. 220 (2005).

> /s/ Jonathan S. Wesson
> Jonathan S. Wesson
> State Bar No. ASB-7944-E58J
> Attorney for Frank C. Baird, II
> WESSON & WESSON, LLC
> 212 Main Street
> Warrior, AL 35180
> 205.590.1128
> wessonandwesson@bellsouth.net

**ADDENDUM TO THE PRESENTENCE REPORT**
**UNITED STATES V. FRANK C. BAIRD, II**
**NORTHERN DISTRICT OF ALABAMA**
**DOCKET NO. 2:05-CR-523-LSC-PWG, SECOND SUPERSEDING**

The following are revisions to the presentence report: Paragraphs 10,12, 37, 48, 51, and 97.

## Objections by the Government

The Government filed no objections to the presentence report.

## Objections by the Defendant

The defendant, through counsel, Jonathan S. Wesson, filed the following objections to the presentence report:

**Objection #1 (Other Names)**: The defendant asserts that he has never used the names "Lewis Golden" or "Frank Golden."

**Probation Officer's Response**: As stated in the paragraph following the "Other Names" section of the presentence investigation report, "The Probation Office is required to advise the Court of any names found in records which identify the defendant." These names were listed as aliases on public asset records accessed online through Westlaw.

**Objection #2 (Paragraph 12)**: The defendant objects to the statement that he transported JF #1 from Warrior, Alabama, to Atlanta, Georgia.

**Probation Officer's Response**: The presentence report has been changed to reflect the corrected language. However, this does not impact the guideline calculations as explained in this officer's response to objection #4 below.

**Objection #3 (Paragraph 37)**: The defendant objects to the enhancement that his conduct was sadistic or masochistic in nature.

**Probation Officer's Response**: The defendant stated that the "bead" which was attached to JF #2's vagina did not cause her discomfort. Since it is unlikely that JF #2 will testify regarding this matter at the time of sentencing, the wording has been removed. However, this does not change the applicability of this enhancement. The enhancement is appropriate based solely on JF #2 inserting a 12-inch dildo into her vagina, which she states is painful. Sado-masochism is defined in the 2006 version of the Merriam-Webster's Collegiate Dictionary as "the derivation of pleasure from the infliction of physical or mental pain either on others or on oneself." As JF #2 can be heard on the videotape describing the conduct as painful, the probation office maintains that the enhancement applies.

**Objection #4 (Paragraph 48)**: The defendant objects to the cross-reference to §2G2.1 and that it is not applicable because the defendant did not *transport* JF #1 in order to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct.

**Probation Officer's Response**: The presentence report has been changed to reflect that the cross-reference applies because the defendant caused or offered a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct.

Furthermore, the defendant asserts that the application of the cross-reference is contrary to the plea agreement and not contained in the factual basis contained therein. The defendant entered into a plea pursuant to Rule 11(c)(1)(B), which is not binding upon the court. According to Publication 107 of the *Probation and Pretrial Services Division, Administrative Office of the United States Courts*, the probation officer is to present all information about the offense that is relevant to the application of the sentencing guidelines including the facts pertaining to *relevant conduct*, specific offense characteristics, and appropriate guideline adjustments. Further, the Supreme Court stated in U.S. v. Booker/Fanfan that under a mandatory guideline scheme, the defendant's sixth amendment rights are violated. However, the court held that under an advisory guideline system, the defendant's sixth amendment rights are not implicated. Under the remedial portion of Booker, judges must consult the guidelines, but adherence is no longer mandatory. In U.S. v. Crawford, 407 F. 3d. 1174 (11th Cir. 2005), the court stated that the consultation requirement in Booker obliges the court to calculate the guidelines correctly. Another post-Booker Eleventh Circuit case, U.S. v. Duncan, 400 F.3d 1297 (11th Cir. 2005), advises that the court is to take into account "extra-verdict" enhancements. The court stated, "The other reason we know that the use of extra-verdict enhancements in a non-mandatory guidelines system is not unconstitutional is that the other Booker majority opinion, the one authored by Justice Breyer, specifically provides for extra-verdict enhancements in all future sentencings. The court specifically held that the guidelines system was constitutional once two parts of the Sentencing Reform Act were excised: the part in 18 U.S.C. § 3553(b)(1) making the guidelines result binding on the sentencing court; and the part in §3742(e) requiring de novo review of sentences on appeal." The court further explained, "Thus, nothing in Booker erodes our binding precedent. The court in Booker suggests that sentencing judges can continue to consider relevant acquitted conduct when applying the guidelines in an advisory manner, 'for when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.'" U.S. v. Duncan also clarified that the standard of proof for these facts is a preponderance of the evidence.

Although the defendant did not plead guilty to count eight of the indictment, this conduct may be considered pursuant to U.S.S.G. § 1B1.3 (a)(1)(A) and count 17, to which the defendant pled guilty, encompasses this conduct. Therefore, the cross-reference is correctly applied.

**Objection #5 (Paragraph 51)**: The defendant objects to the enhancement based on the minor (JF #1) being in his care, custody, or supervisory control.

**Probation Officer's Response**: This enhancement was based on the initial understanding that JF #1 had traveled from Alabama to Georgia with the defendant. As it appears that this was not the case, there is insufficient evidence to further support this enhancement. Therefore, it has been removed from the presentence report. However, it does not impact the overall guideline calculations.

**Objection #6 (Paragraph 64)**: The defendant objects to the enhancement for sado-masochistic conduct.

**Probation Officer's Response**: Sado-masochism is defined as "the derivation of pleasure from the infliction of physical or mental pain either on others or on oneself." JF #2 can be heard in a previous videotape describing the conduct of inserting a 12-inch dildo into her vagina as painful; therefore, the enhancement applies.

**Objection #7 (Paragraphs 75 and 81)**: The defendant objects to the "division" of count 21 into two groups.

**Probation Officer's Response**: As stated in the presentence report, this was done pursuant to the directive given at §2G2.1(d)(1). Therefore, the presentence report remains unchanged.

**Objection #9 (Paragraphs 110 and 111)**: The defendant objects to the Chapter Four Enhancement pursuant to § 4B1.5(b).

**Probation Officer's Response**: According to the _Background_ at §4B1.5, this section was added by the Sentencing Commission at the direction of Congress in section 505 of Public Law 105-314 to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors. This section is not exclusive to repeat sexual offenders, as the defendant implies.

**Objection #10 (Paragraphs 112 through 119)**: The defendant objects to the information included as Offense Behavior Not Part of Relevant Conduct.

**Probation Officer's Response**: According to Publication 107 of the _Probation and Pretrial Services Division, Administrative Office of the United States Courts_, "[i]f sufficient reliable information is present to establish that the conduct took place, it may be included in this section." Senior U.S. Probation Officer Alton Morgado's analysis of the video tapes and/or pictures support the inclusion of this information in the presentence report.

**Objection #11 (Paragraphs 138-140)**: The defendant provided additional information he wishes the court to consider when determining his ability to pay a fine.

**Probation Officer's Response**: The information contained in this section was provided by the defendant, as well as his power of attorney. The defendant did not report to this officer ownership of farm equipment, the size of the family farm, and the listing price of his home located at 315 Louisa Street. This information was ascertained through interviewing Mr. Davis, the defendant's power of attorney. No changes have been made to the presentence report.

**Objections #8 and #12 (Paragraphs 107, 109, and 145)**: The defendant objects to the overall guideline calculations.

**Probation Officer's Response**: Based upon the above responses, this officer maintains her position that the guideline calculations are accurately calculated.

**Objection #13**: The defendant objects, generally, to all computations contrary to the Sixth Amendment, Blakely v. Washington, and U.S. v. Booker.

**Probation Officer's Response**: It is noted that the Eleventh Circuit has stated that the district court "remains obliged to 'consult' and 'take into account' the Guidelines in sentencing." Further, "[a]fter it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable." See U.S. v. Crawford, 407 F.3d 1174 (11th Cir. 2005).

Respectfully Submitted,

/s

Kimberlee Franklin
Senior U.S. Probation Officer

Approved:

6/15/2006

_____

/s

Junie P. Richard                    Date
Supervising U.S. Probation Officer

BIRMINGHAM DISTRICT COURT                    SEARCH WARRANT

STATE OF ALABAMA

-------------------------------------------------------------------------------------------------------------

TO:   ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA.

Proof by affidavit having this day been made before me as Judge of the Birmingham
District Court of Jefferson County, Alabama and the Court's finding that grounds for the
issuance exist or that there is probable cause to believe that:

Evidence of crimes to wit: "Endangering the welfare of a child" Section13a-13-6 and
"Public Lewdness" Section 13A-12-130, images, documents, records, and other types of
information are stored on 3 rolls of 35 millimeter film, his digital camera with the 1 Gigabyte
Lexar Compact Flash Card and his Verizon LG Camera Phone and in a 2005 Chevrolet
Silverado Pickup Truck VIN " 1GCEK14TX5Z270205" BEARING Alabama tag # "FBFARM"

You are therefore commanded to make, an immediate search of the property described
above, for the above described evidence, and if you find the same, or any part thereof to seize the
same and examine the evidence therein. And you are hereby commanded to make a return of
this writ within ten (10) days as required by law.

Issued to Deputy R. D. Reid at _____ 7. 30 _____ A.M. /P.M.   Dated this September 22, 2005

_____Laura Petro_____
JUDGE, BIRMINGHAM DISTRICT COURT
OF JEFFERSON COUNTY, ALABAMA
          Circuit



## RETURN AND INVENTORY

I certify that I executed the foregoing Search Warrant as directed therein by searching the person(s), place or thing therein described at _3_ o'clock, _A_ .M. _SEPTEMBER 13_, 2005, and:

{   }   Did not find and seize any property located thereon. OR:

{ ✗ }   Found and seized the following-described property and made return of same to the Court at _____ o'clock. _____M., _____, 2005

☑ Digital evidence to be examined further

----------------------------------------------------------------------
--------------------------- _SEE ATTACHED SHEETS_ ---------------------
----------------------------------------------------------------------
----------------------------------------------------------------------

Copy of warrant and endorsed copy of inventory

{   }   Given to: _____
{   }   Left at or in place or thing searched.
{   }   Attached to item(s).
{   }   Filed in District Court

_____
Judge Jefferson County District Court

_____        _____
Law Enforcement Officer                 Jefferson County Sheriff's Office
                                        Agency

JEFFERSON COUNTY DISTRICT COURT                                  AFFIDAVIT FOR

STATE OF ALABAMA                                               SEARCH WARRANT
-------------------------------------------------------------------------------------------------------------
Before me, Judge of the Birmingham District Court of Jefferson County, Alabama, personally
appeared, Deputy R. D. Reid who after being duly sworn, upon his oath, deposes and says as
follows:

That I am currently a Deputy Sheriff with the Jefferson County Sheriff's Office, Jefferson
County, Alabama, and that the contents of this affidavit are based on my training, professional
experience, and knowledge and facts conveyed to me by other investigators.

That I am currently investigating a complaint involving the Production of Child Pornography by
an individual named Frank Baird.

During the course of my investigation I have interviewed two witnesses, both of whom stated
that Frank Baird took nude pictures of minor children.

On September 22, 2005 I went to an area in Pinson Alabama near Turkey Creek called the "Blue
Hole" where Frank Baird, Bonnie White and Kimberly White (17 year old minor child) were.
When I arrived at this location I found that Baird had been taking photographs of Kimberly
White displaying breast nudity. Frank Baird and Bonnie White were arrested for Contributing to
the Delinquency of a Child (White) and Complicity to Public Lewdness (Baird). Baird was in
possession of one 35 millimeter camera, a digital camera and also had two rolls of 35 millimeter
film and a Verizon LG Camera Phone in his pocket. Deputies recovered a 1 Gigabyte Lexar
Compact Flash Card from in-between the tag and body of Baird's truck a 2005 Chevrolet
Silverado Pickup Truck VIN " 1GCEK14TX5Z270205" BEARING Alabama tag # "FBFARM",
and recovered a roll of 35 millimeter film from under the gas cap cover of the same truck. These
items were removed as they were in danger of being lost as Baird's vehicle was being towed.
Baird's vehicle was towed to Jefferson County Sheriff's Office Headquarters and secured.
During and interview Bonnie White stated that Frank Baird took pictures of children and posted
them onto a web site. During a separate interview Kimberly white stated that Frank Baird had
asked her to pose for pictures when she was 13 or 14 years old, but she did not.

Based on my experience, investigations, training, and information provided to me by other
trained investigators, I have become knowledgeable in the use of computers and peripheral
devices to facilitate crimes such as "Endangering the welfare of a child" Section13a-13-6,
"Possession of Child Pornography" Section 13A-12-192 and "Soliciting a Child by Computer"
Section 13A-6-110 and knowledgeable in sex crimes and pedophile's common practices and
methods for procuring victims.

I therefore have probable cause to believe and do believe that Frank Baird was using his 3 rolls
of 35 millimeter film, his digital camera with the 1 Gigabyte Lexar Compact Flash Card and his
Verizon LG Camera Phone to facilitate the crime of "Endangering the welfare of a child"
Section13a-13-6 and "Public Lewdness" Section 13A-12-130 as listed above and that Frank
Baird has stored in and on these items now located at Jefferson County Sheriff's Office

Headquarters, images, documents, records, and other types of information that are evidence in the crime of "Endangering the welfare of a child" Section13a-13-6 and "Public Lewdness" Section 13A-12-130.

As described in this affidavit electronic media, software, and data are instrumentalities and evidence in the commission of this crime. Based on my training and experience, I know that searching and seizing information from electronic media such as camera phones and flash cards requires the devices to be searched by qualified computer experts in a controlled environment.

A search of the electronic media, both text and image files will need to be conducted off-site. Searching electronic media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. Data search procedures require exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.

Since electronic evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap") it is necessary to make an exact bit for bit copy or a "forensic image" of the evidence in a controlled environment to ensure that the original data is not altered and that a complete and accurate analysis is performed.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property contains evidence of "Endangering the welfare of a child" Section13a-13-6 and "Public Lewdness" Section 13A-12-130 and that said evidence is also stored in Baird's 2005 Chevrolet Silverado Pickup Truck VIN " 1GCEK14TX5Z270205" BEARING Alabama tag # "FBFARM" and is subject to search.

Subscribed and sworn before me
This September 22, 2005

AFFIANT

JUDGE, DISTRICT CIRCUIT
JEFFERSON COUNTY, ALABAMA

FILED

2006 Feb-08 PM 04:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

JEFFERSON COUNTY CIRCUIT COURT                    AFFIDAVIT FOR

STATE OF ALABAMA                                  SEARCH WARRANT

Before me, Judge of the Birmingham Circuit Court of Jefferson County, Alabama, personally
appeared, Darrell Reid who after being duly sworn, upon his oath, deposes and says as follows:

That I am currently a Deputy Investigator of the Jefferson County Sheriff's Office, Jefferson
County, Alabama.

That I am currently investigating a white male by the name of Frank Baird who owns a business
at called Amtax at 415 Main Street, Warrior, Al 35180 where Frank Baird has a business license
to operate a "Bookkeepers – Tax Consultation" service.

On August 15, 2005 I interviewed Tommie Wade, 32 years of age who was a customer of Mr.
Baird's photographic studio he was operating in the back of the Amtax business. She advised
me that she had posed for him in that same back room several times over the past 2 years in the
nude and he pays her cash to pose. She advised me that he used a camera and he had boxes of
photographs stacked around the room.

On September 9, 2005 I interviewed April Gilland (Butler), W/F, 27 years of age, who was a
customer of Mr. Baird's photographic studio he was operating in the back of his Amtax business.
She stated that she was paid to pose nude while he took photographs of her and this occurred in
the back room. She stated he used a camera to take the photographs. April Gilland was the
former secretary for Mr. Baird at his Amtax business. April Gilland stated that there is more
than one computer in the Amtax business that Mr. Baird uses for his tax business.

On September 20, 2005 I conducted surveillance on the business and it is a building, blue in
color and it has a sign reading Amtax. This building is located at 415 Main Street, Warrior, Al
35180 located inside the Birmingham Division of Jefferson County.

On September 22, 2005, I was assigned to investigate a case where Mr. Baird was reported to be
taking photographs of a nude female in the Turkey Creek area. Deputy Greg Sanders, and
Deputy Marbutt responded and located Mr. Baird taking photographs of a 17 year old nude
female, Kimberly White. He was arrested for "Complicity to Commit Public Lewdness".

On September 22, 2005 I attempted to interview Mr. Baird at the Jefferson County Sheriff's
Office, Headquarters where he invoked his rights and refused to answer any questions. I
interviewed the Mother, Bonnie White, of the 17 year old nude female, Kimberly White and she
stated that she had called Mr. Baird at Amtax and inquired about having some old photographs
he had made of the family in the past. Mr. Baird then inquired about making some photographs
of her 17 year old daughter. She did not hire him to take nude photographs of her. She did
allow him to take what she reported to be normal, clothed studio type photographs. Mr. Baird
asked her to have a bathing suit for her daughter and Mrs. White stated she wouldn't bring one
for her. Mr. Baird brought various changes of clothing, including a bathing suit for Kimberly
White to pose in while he took photographs. Kimberly White stated she started off clothed, but



EXHIBIT

D

be kept changing her poses and had her remove her top and she was nude and her breast were exposed. This was observed by the Deputies when they arose up on the scene. The mother was present during the photographing and attempted to stop him but she was scared to argue too much.

During the initial investigation and arrest, Mr. Baird hid a digital photo memory stick and film on his vehicle. This was recovered by the arresting deputies. Based on this recovered evidence I obtained a search warrant for his vehicle and film. This search warrant was executed on September 29, 2005. Computer Forensic Examiner Carl Carpenter conducted an exam on the digital photographic flash card that Mr. Baird had on his person and it contained photographs of nude women in different poses. The film that was recovered had photographs of Kimberly White and she was also posing, both clothed and nude in photographs that were taken at the site where Mr. Baird was arrested. This supports the statements from the witnesses above that Mr. Baird is operating a Photography Studio without a Business License in Jefferson County.

Lt. Logan contacted the Jefferson County Revenue Department and talked with the examiner and he stated that the business license for Amtax was in the name of Frank Baird and it only authorized the preparation of taxes, consultation for taxes and general bookkeeping. There was no business license for operating a photo studio, in violation of Alabama State Code 40-12-108. Operating a Business without a License. The Revenue Department faxed a copy of the business license to me and it is attached as "Attachment A". This business license indicates the business is located at 415 Main Street, Warrior, Al 35180.

Based on my training, education, experience, numerous investigations and information I have received from our Computer Forensic Unit in the past, I am aware that people that take photographs using digital cameras and film cameras use computers to store, print and produce photographs. Based on my investigation and the above information I believe and do believe that Mr. Baird has photographic equipment, cameras, digital storage devices, film, photographic photography props, clothes, computers, printers, and other equipment used to operate a photographic studio located in his business. Amtax at 415 Main Street, Warrior, AL.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, i.e., evidence of Operating a Business without a License is located upon or within the aforesaid property, and the above described is subject to seizure and that this affidavit is that a warrant may issue to search the said premises, place or thing.

Subscribed and sworn before me
This 30th Day September, 2005

_____
JUDGE, CIRCUIT
JEFFERSON COUNTY ALABAMA

BIRMINGHAM DISTRICT COURT                    SEARCH WARRANT

STATE OF ALABAMA

---------------------------------------------------------------------------------------------------------------

TO:    ANY LAWFUL DEPUTY SHERIFF OF JEFFERSON COUNTY, ALABAMA OR
       LAWFUL OFFICER OF THE STATE OF ALABAMA.

       Proof by affidavit having this day been made before me as Judge of the Birmingham
District Court of Jefferson County, Alabama and the Court's finding that grounds for the
issuance exist or that there is probable cause to believe that:

          .   Evidence of crimes to wit: Child Pornography is located in a single story red brick
house with the number 601 number located on the power meter on the house, located in Jefferson
County, the Birmingham Division and a hay barn is located on the property and a red in color
1997 Chevrolet Camaro with a tag number of BAIRD2 is located behind the house and this
house, curtilage, outbuildings and vehicles on this property contains computers, cameras,
photographs, notes, emails, evidence of Child Pornography and other items listed on Attachment
A in regards to possession of Child Pornography, specifically photographs of children under the
age of 17 as defined by 13A-12-191 and 13A-12-192, 18 U.S.C. § 2256 and other evidence of
crimes.

       You are therefore commanded to make, in the daytime, an immediate search of the
person/property described above, a better description of which is not available, for the above
described evidence, and if you find the same, or any part thereof to seize the same and hold it
until further order from the Birmingham District Court of Jefferson County, Alabama. And you
are hereby commanded to make a return of this writ within ten (10) days as required by law.

       Issued to Deputy Darreil Reid _____ 7 . 3 0 _____ AM/PM.

       Dated this 2 6 day of September, 2005

                                        _____
                                        JUDGE, BIRMINGHAM DISTRICT COURT
                                        OF JEFFERSON COUNTY, ALABAMA

EXHIBIT

E

## ATTACHMENT A

## ITEMS TO BE SEARCHED FOR AND SEIZED

1. Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

   a. any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tapes, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange Formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

   b. books and magazines containing visual depictions of minors engaged n sexually explicit conduct, as defined in 18 U.S.C. § 2256;

   c. originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   d. motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

2. Information or correspondence pertaining to the possession or attempted distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received

using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited:

   a. envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   b. books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

3. Records or other items which evidence ownership of use of computer equipment found in the above residence, including but not limited to, sales receipts, bills for Internet access, and handwritten notes.

RETURN AND INVENTORY

I certify that I executed the foregoing Search Warrant as
directed therein by searching the person s/, place or thing
therein described at  5:30 p.m o'clock on
September 20 , 2005, and:

(  ) Did not find and seize any property located
thereon, or:

( ✓ Found and seized the following-described
property and made

Return of same to the Court at
_____ on _____, 2005.

_____

_____ SEE  ATTACHED  SHEET _____

_____

OR ( ✗ ) See attached Search Warrant Worksheet.

Copy of warrant and endorsed copy of inventory

(  ) Given to: _____

( ✗ ) Left at or in the place or thing searched.

I hereby certify that all evidence of return of the foregoing
search warrant and inventory, on this _____ day of March, 2005.

JUDGE, BIRMINGHAM DISTRICT COURT
OF JEFFERSON COUNTY, ALABAMA

## SEARCH WARRANT WORKSHEET

SHERIFF -- 120

ADDRESS WARRANT SERVED ON: 601 Arkadelphia Rd.

COMPLAINT NUMBER: _____ OFFICER IN CHARGE: _____

OFFICERS PRESENT: Lt. Logan, Sgt Thompson, Sgt Bridges
Edge, Reed, Carpenter, Reeves, Yates

DATE ENTERED: 7-16-05 _____ TIME ENTERED: 5:30 pm _____ EXITED: 7:00 pm

COPY OF WARRANT GIVEN TO: Left At Residence

PHOTOS TAKEN BY: Yates _____ MIRANDA READ BY: _____ DATE: _____

ITEMS SEIZED TURNED OVER TO OFFICER: _____

| ITEMS SEIZED | LOCATION FOUND | TIME | OFFICER |
|---|---|---|---|
| 1) Silver Camera case w/ Camera | Kitchen | | RDR |
| 2) Black Video storage box w/ Videos | Laundry | | ROD |
| 3) Assorted Videos | Sofa Living Room | | RDR |
| 4) Blue Storage Box w/ Videos | Floor Living Room | | RDR |
| 5) Hmeasure Bag w/ 8mm Tapes | Floor Living Room | | RDR |
| 6) Sony Handycam " 13535 " | Floor of Living Rm | | RDR |
| 7) Sony Maxell No. 360 CR " | Floor of Living Rm | | RDR |
| 8) Manilla Envelope w/ Photos | Floor of Living Room | | RDR |
| 9) Paperwork + Photos | Floor By Sofa | | RDR |
| 10) New Balance Box w/ 8mm Video | Floor under Sofa | | RDR |
| 11) Box w/ Photos, Video, Paperwork | Master Bedroom | | RDR |
| 12) Box + Household Projects | Trunk of Red Camaro Tag # BATRR 2 | | RDR |
| 13) | | | |
| 14) | | | |
| 15) | | | |
| 16) | | | |



415 MAIN St
WARRIOR, AL. 35180

JEFFERSON COUNTY DISTRICT COURT                                 AFFIDAVIT FOR

STATE OF ALABAMA                                                SEARCH WARRANT
------------------------------------------------------------------------------------------------------------------------

Before me, Judge of the Birmingham District Court of Jefferson County, Alabama, personally appeared, Darrell Reid who after being duly sworn, upon his oath, deposes and says as follows:

That I am currently a Deputy Sheriff, of the Jefferson County Sheriff's Office, Jefferson County, Alabama.

That I am currently investigating an individual by the name of Frank Baird who resides at 601 Arkedalphia Road. Warrior, Al and operating a business call Amtax located at 415 Main Street, Warrior, Al 35180 where Frank Baird has a business license to operate a "Bookkeepers – Tax Consultation" service.

On September 22, 2005 I went to an area in Pinson Alabama near Turkey Creek called the "Blue Hole" where Frank Baird, Bonnie White and Kimberly White (17 year old minor child) were. When I arrived at this location I found that Baird had been taking photographs of Kimberly White displaying breast nudity. Frank Baird and Bonnie White were arrested for and Complicity to commit Public Lewdness (Baird). Baird was in possession of one 35 millimeter camera, a digital camera and also had two rolls of 35 millimeter film and a Verizon LG Camera Phone in his pocket. Deputies recovered a 1 Gigabyte Lexar Compact Flash Card from in-between the tag and body of Baird's truck a 2005 Chevrolet Silverado Pickup Truck VIN " 1GCEK14TX5Z270205" BEARING Alabama tag # "FBFARM". and recovered a roll of 35 millimeter film from under the gas cap cover of the same truck. These items were removed as they were in danger of being lost as Baird's vehicle was being towed. Baird's vehicle was towed to Jefferson County Sheriff's Office Headquarters and secured. During and interview Bonnie White stated that Frank Baird took pictures of children and posted them onto a web site. During a separate interview Kimberly white stated that Frank Baird had asked her to pose for pictures when she was 13 or 14 years old, but she did not.

I was familiar with Frank Baird from when I began an investigation back in August of this year due to complaints of him taking photographs at his business, house and various locations in Jefferson County. In regards to that initial investigation, I conducted some interviews.

On August 13, 2005 I interviewed Tommie Wade, 32 years of age who was a customer of Mr. Baird's photographic studio he was operating in the back of the Amtax business. She advised me that she had posed for him in that same back room several times over the past 2 years in the nude and he pays her cash to pose. She advised me that he used a camera and he had boxes of photographs stacked around the room.

On September 9, 2005 I interviewed April Gilland (Butler), W/F, 27 years of age, who was a customer of Mr. Baird's photographic studio he was operating in the back of his Amtax business. She stated that she was paid to pose nude while he took photographs of her and this occurred in the back room. She stated he used a camera to take the photographs. April Gilland was the former secretary for Mr. Baird at his Amtax business. April Gilland stated that there is more than one computer in the Amtax business that Mr. Baird uses for his tax business.

On September 22, 2005 I conducted surveillance on the business and it is a building, blue in color and it has a sign reading Amtax. This building is located at 415 Main Street, Warrior, Al 35180 located inside the Birmingham Division of Jefferson County.

On September 22, 2005, I was assigned to investigate a case where Mr. Baird was reported to be taking photographs of a nude female at the Turkey Creek area. Deputy Greg Sanders, and Deputy Marbutt responded and located Mr. Baird taking photographs of a 17 year old nude female. Kimberly White. He was arrested for "Complicity to commit Public Lewdness".

On September 22, 2005 I attempted to interview Mr. Baird at the Jefferson County Sheriff's Office, Headquarters where he invoked his rights and refused to answer any questions. I interviewed the Mother (Bonnie White) of the 17 year old nude female, Kimberly White and she stated that she had called Mr. Baird at Amtax and inquired about having some old photographs he had made of the family in the past. Mr. Baird then inquired about making some photographs of her 17 year old daughter. She did not hire him to take nude photographs of her. She did allow him to take what she reported to be normal clothes studio type photographs. Mr. Baird asked her to have a bathing suit for her daughter and Mrs. White stated she wouldn't bring one for her. Mr. Baird brought various changes of clothing, including a bathing suit for Kimberly White to pose in while he took photographs. Kimberly White stated she started off clothed, but he kept changing her poses and had her remove her top and she was nude and her breast were exposed. This was observed by the Deputies when they drove up on the scene. The Mother was present during the photographing and attempted to stop him, but she was scared to argue too much.

During the initial investigation and arrest, Mr. Baird hid a digital photo memory stick and film on his vehicle. This was recovered by the arresting deputies. Based on this recovered evidence I obtained a search warrant for his vehicle and the digital media on September 22, 2005. The search warrant was executed on September 23, 2005. Computer Forensic Examiner Carl Carpenter conducted an exam on the digital photographic flash card that Mr. Baird had on his person and it contained photographs of nude women in different poses. The film that was recovered had photographs of Kimberly White and she was also posing, both clothed and nude in photographs that were taken at the site where Mr. Baird was arrested. This supports the statements from the witnesses above that Mr. Baird is operating a Photography Studio without a Business License in Jefferson County.

Based on the information that Frank Baird was operating a photography studio out of his tax office and his business license did not support that type of business, I obtained a search warrant for his business and executed it on September 23, 2005 for "Operating a Business without a License". Upon entering his business I located the room where some of the photographs I had seen on the recovered evidence from his vehicle had been photographed. In this room he had numerous clothes and props for the photographic studio. He also had numerous photo software for producing photographs on computers. I also located thousands of photographs of girls and women posing both clothes and nude. Many of the photographs were taken in his office and others were taken outside and in what appears to be a house. There were photographs of girls and women on a bed and in various poses at a house. I also recovered photographic equipment, cameras, film, very large photographic paper, 2 special photo printers, and other items related to his illegal business. In addition, numerous disks with girls names written on them were recovered, along with multiple computers and other digital storage devices. I also located nude photographs of girls on the computer printer that were down loaded from the Internet.

On September 24 and 26, 2005 I began to review all the evidence for preparation for obtaining an arrest warrant for Frank Baird for operating a business without a license. I wrote a report and started logging all the evidence. I then went and obtained a warrant for Mr. Baird for the crime of Operating a Business Without a License.

During my review of the evidence I noticed some photographs that were taken of younger looking girls that were found locked in a filing cabinet in the storage room by his studio in his Amtax office. These photographs had names on them and they were dated by the photography company when they were developed. I began to pull the driver license photographs that corresponded to those names. I located one in particular, named Lacie Allena Rhodes and she matched the girl in the photographs where Frank Baird had labeled them Lacie Rhodes. Lacie Rhodes date of birth is 2/22/87 making her 18 years of age as of February of this year. However, I noted that many of the photographs were taken and produced when she was 16 years of age.

I located one red in color photo pack marked "lacie" and not dated. This package contained 13 photographs of 16 year old Lacie Rhodes wearing a sports type bra and posing. The first photograph is of 16 year old Lacie Rhodes holding a sign that reads "16". These photographs match the 13 negatives that were in the same pack.

I located a blue and orange "Photo Works" package with an address of 1260 16th Avenue West, Seattle, WA 98119. This package list the name Frank Baird, 17 MAR 2003, Customer # 25096602, roll: 51629989. In addition, there is a computer generated type label that states "LACIE RHODES SHOOT 1 2003". In this package is a Photo Works thumb nail sheet with all 38 photographs on it, with the corresponding roll number and the date of Mar 17 03. These thumbnail photographs correspond to the photographs inside the package. These photographs are of 16 year old Lacie Rhodes in various poses on a bed in a house. In these photographs she is wearing a white see through type bra and panties where her pubic hair can bee seen through the panties and out the side of the panties. The poses appear to be of a sexually nature. There is also a Photo Works disk in this package that has the same roll number and date of March 17, 2003.

I located another blue and orange "Photo Works" package with no address, but a phone number of 1-800-746-8696. This package list the name of Frank Baird, 5 SEP 2003, Customer # 25096602, roll: 54312766. In addition, there is a hand written name of "lacie" on the package. This package contained a "Photo Works" thumb nail sheet with 38 photographs displayed. However, there are 2 of most photographs indicating a double print order. There are 2 missing photographs. Of the photographs present, they are of 16 year old Lacie Rhodes in full nudity and the majority has her posing with a purple in color, sex toy, commonly referred to as a "dildo". In these photographs, she is posing with the sex toy on top of her exposed vagina and with the sex toy in her mouth. There is also a photo works disk with the same roll number and a date of September 5, 2003. These photographs were taken in the same room as the previous listed photographs.

I located other photographs taken in 2003 that were taken of 16 year old Lacie Rhodes in sexually explicit poses.

During the search warrant at his business, I located a copy of the Alabama definitions of "Child Pornography" and "Solicitation of a Minor" that was on the desk in Frank Baird's tax office.

On September 26, 2005 I received a phone call from Frank Baird (son of Frank Baird) from (270) 339-5436 who currently resides in Kentucky. He stated that his father has a history of taking photographs of nude woman and young girls and he has many photographs and computers that contain these type images in his house located at 601 Arkadelphia Road in Warrior, Al.

When Frank Baird was arrested on September 22, 2005 he provided his home address as 601 Arkadelphia Road, Warrior, Al. A check of our report files also indicated his has provided this

same address as his home address in 1997 when he filed a police report. Deputy Brian Reeves at my request on September 26, 2005 went to the residence and he located the house with the assistance of Chief Ray Horn of Warrior PD. This house had been described to me by Mr. Baird's son. Deputy Reeves described the house to me as a single story red brick house with the number 601 number located on the power meter on the house, located in Jefferson County, the Birmingham Division and a hay barn is located on the property and a red in color 1997 Chevrolet Camaro with a tag number of BAIRD2 is located behind the house. This vehicle is registered to Frank Baird at 601 Arkadelphia Road, Warrior, Al.

Based on my past experience, numerous investigations, and in training for child pornography, I know that people that produce, possess, and keep child pornography keep their photographs stored in both printed form, such as in photographs and in digital form, such as on disk, digital cameras, thumb drives, computers and other digital storage devices. People that keep and view child pornography often keep these items in their businesses and in their homes to allow them easy access. This was found to be true when a search warrant was executed on Mr. Baird's business on September 23, 2005. I have become knowledgeable in the use of computer and peripheral devices to facilitate crimes such as "Endangering the welfare of a child" Section 13A-13-6, "Possession of Child Pornography" Section 13A-12-191 and Section 13A-12-192 and "Solicitation of a Child by Computer" Section 13A-6-110 and knowledgeable in sex crimes and pedophile's common practices and methods for procuring victims.

Alabama law defines these crimes as

13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts.

Any person who shall knowingly disseminate or display publicly any obscene matter containing a visual reproduction of a person under the age of 17 years engaged in any act of sado-masochistic abuse, sexual intercourse, sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a Class B Felony.

13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate; penalty.

(a) Any person who knowingly possess with intent to disseminate any obscene matter containing a visual reproduction of a person under the age of obscene matter containing visual reproduction of a person under the age of sexual excitement, masturbation, breast nudity, genital nudity, or other sexual conduct shall be guilty of a Class B Felony. Possession of three or more copies of the same obscene material is prima facie evidence of possession with intent to disseminate the same.

(b) Any person who knowingly possesses any obscene matter containing a visual reproduction of a person under the age of 17 year engaged in any act of sadomasochistic abuse, sexual intercourse, sexual excitement, masturbation, genital nudity, or other sexual conduct shall be guilty of a Class C Felony.

Based on past experience, numerous investigations, training, computer forensic examinations provided to me, and information provided to me by other trained investigators, I have become knowledgeable in the use of computers to obtain, store and produce child pornography, including

digital photographs, images, descriptions, email communications, and other data related to child pornography that is often found on the storage devices, hard drives and other media related to computers I therefore have probable cause to believe and do believe that Frank Baird was using a computer and peripheral devices to commit crimes as listed above and that Frank Baird has stored in his computer hard drives, computer peripheral devices and other electronic storage devices images, digital photographs, web site addresses, email communications, and other data related to child pornography.

As described in this affidavit computer hardware, software, and data are instrumentalities and evidence in the commission of this crime. Based on my training and experience, I know that searching and seizing information from computers requires all electronic storage devices (along with related peripherals) to be searched later by qualified computer experts in a controlled environment.

A search of computer records, both text and image files will need to be conducted off-site. These devices require many hours to analyze and an off-site search is necessary because computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files and/or programs are evidence or instrumentalities of crime. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site. Further, searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. Data search procedures require exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, and password-protected, or encrypted files.

Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap") a controlled environment is essential to its complete and accurate analysis.

Based on my training, experience and consultation with technical computer experts, I know that searching computerized information for evidence or instrumentality's of crime commonly requires the seizure of all of a computer system's input/output peripheral devices (including related documentation, passwords, and security devices) so that a qualified computer expert can accurately retrieve the system's data in a controlled environment. Peripheral devices that allow user to enter and retrieve data from storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system it is important that the analyst be able to properly retrieve the evidence listed above.

In addition, the analyst needs the relevant system software (operating Systems, interfaces, and hardware drivers) any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

Definitions:

Hardware: "The physical components or equipment that makes up a computer system..." Examples include keyboards, monitors, and printer.

Software: "The programs or instructions that tells a computer what to do." This includes system programs, which control the internal operation of the computer system (such as Microsoft's Disk operating System, "MS-DOS," that controls IBM-compatible PCs) and applications Programs that enable the computer to produce useful work (e.g., a word processing program such as WordPerfect).

Data: "A formalized representation of facts or concepts suitable for communication, interpretation, or processing by people or by automatic means." Data is often used to refer to the information stored in the computer.

Input/output Device: A piece of equipment, which sends data to, or receives data from a computer. Keyboards, monitors, and printers are all common input/output devices.

Network: A system of interconnected computer systems and terminals."

Based on past experience, training, prior investigations and information relayed to me by other trained investigators the seizure of computers and peripheral devices are necessary for an off-site search to be conducted by personnel particularly trained in retrieving data from these devices and that actually capturing hard-drive information on-site is difficult and our current devices and software does not allow us to mirror-image the hard drive on-site. I have also listed items on Attachment A that are commonly used for storage, production and possession of child pornography and evidence of child pornography.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, evidence of Child Pornography is located in the computer hard drives, electronic storage devices, cameras, photographs, printed form, digital form and other electronic items as listed on attachment "A" and located upon or within the aforesaid property, and the above described is subject to seizure and makes this affidavit so that a warrant may issue to search the said premises, place or thing.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, i.e., evidence of "Endangering the welfare of a child" Section 13A-13-6, "Possession of Child Pornography" Section 13A-12-191 and Section 13A-12-192 and "Solicitation of a Child by Computer" Section 13A-6-110 Child Pornography, 13A-12-191 and 13A-12-192, 18 U.S.C. § 2256 and other evidence of crimes is located upon or within the aforesaid property, and vehicle and the above described is subject to seizure and makes this affidavit so that a warrant may issue to search the said premises, place or thing.

Subscribed and sworn before me
This 26th day of September, 2005

_____
JUDGE, DISTRICT ~~DISTRICT~~ CIRCUIT
JEFFERSON COUNTY, ALABAMA

_____
AFFIANT

## ATTACHMENT A

## ITEMS TO BE SEARCHED FOR AND SEIZED

1. Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

   a. any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tapes, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange Formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

   b. books and magazines containing visual depictions of minors engaged n sexually explicit conduct, as defined in 18 U.S.C. § 2256;

   c. originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   d. motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

2. Information or correspondence pertaining to the possession or attempted distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received

using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited:

a. envelopes, letters, and other correspondence including, but not limited to. electronic mail. chat logs. and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

b. books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests. trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

3. Records or other items which evidence ownership of use of computer equipment found in the above residence, including but not limited to. sales receipts, bills for Internet access, and handwritten notes.

BIRMINGHAM DISTRICT COURT                    SEARCH WARRANT

STATE OF ALABAMA

---------------------------------------------------------------------------------------------------------------

TO:    ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA.

Proof by affidavit having this day been made before me as Judge of the Birmingham District Court of Jefferson County, Alabama and the Court's finding that grounds for the issuance exist or that there is probable cause to believe that:

Evidence of crimes to wit: Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related crimes are located in a beige house, with white post on the front porch, single story wood construction, located at 315 Louisa Street, Warrior, Al and this house and property contains computers, video camera with tripod, video tapes, photographs, dark colored bed cover, sex toys, purple sex toy, peripheral devices, disk, CDs and other digital media storage devices and other evidence of crimes.

You are therefore commanded to make, an immediate search of the property described above, for the above described evidence, and if you find the same, or any part thereof to seize the same and hold it until further order from the Birmingham District Court of Jefferson County, Alabama. And you are hereby commanded to make a return of this writ within ten (10) days as required by law.

Issued to Deputy Darrell Reid at _____ **1 ☉** _____ A.M./P.M.

Dated this September 28, 2005

_____
JUDGE, BIRMINGHAM DISTRICT COURT
OF JEFFERSON COUNTY, ALABAMA


EXHIBIT
F

## RETURN AND INVENTORY

I certify that I executed the foregoing Search Warrant as directed therein by searching the person(s), place or thing therein described at ⟨.⟩:⟨⟩ o'clock. ⟨P⟩ .M. September 2⟨⟩ , 2005, and:

{ }    Did not find and seize any property located thereon. OR:

{ ⟶ }   Found and seized the following-described property and made return
       of same to the Court at _____ o'clock. _____ M.. _____ . 2005

---

SEE  ATTACHED  SHEET

---
---
---
---

Copy of warrant and endorsed copy of inventory
    { }    Given to: _____
    {×}    Left at or in place or thing searched.
    { }    Attached to item(s).
    { }    Filed in District Court


_____
Judge, Jefferson County District Court,


_____          _____
        Law Enforcement Officer                          Jefferson County Sheriff's Office
                                                                    Agency

# SEARCH WARRANT WORKSHEET

SHERIFF — 120

ADDRESS WARRANT SERVED ON: 315 Louisa St. Warrior

COMPLAINT NUMBER: _____ OFFICER IN CHARGE: Reed

OFFICERS PRESENT: Sgt. Thompson
V.F. Edge Carpenter Reed Yates

DATE ENTERED: 9-28-05   TIME ENTERED: 2.08pm   EXITED: 240 PA

COPY OF WARRANT GIVEN TO: _____

PHOTOS TAKEN BY: Yates   MIRANDA READ BY: _____ DATE: N

ITEMS SEIZED TURNED OVER TO OFFICER: _____

| ITEMS SEIZED | LOCATION FOUND | TIME | OFFICER |
|---|---|---|---|
| 1) 1 Bottle KY Liquid | on Bed  Rm 1 | | RDR |
| 2) 1 Red Bed sheet | on Bed  Rm 1 | | RDR |
| 3) Assorted Sex Toys | shelf By Bed | | RDR |
| 4) Camera Tripods (4) | Around Bed  Rm 1 | | RDR |
| 5) RCA Vits Camera #611231375 | Foot of Bed  Rm 1 | | RDR |
| 6) Portable Work Light | Foot on Bed By Camera Rm 1 | | RDR |
| 7) Assorted Clothing, Props | Sofa  Rm 1 | | RDR |
| 8) 2 Photo Lights | Floor Rm 2 | | RDR |
| 9) Photos + Props | Corner Table  Rm 2 | | RDR |
| 10) | | | |
| 11) | | | |
| 12) | | | |
| 13) | | | |
| 14) | | | |
| 15) | | | |

JEFFERSON COUNTY DISTRICT COURT                                  AFFIDAVIT FOR

STATE OF ALABAMA                                               SEARCH WARRANT

---------------------------------------------------------------------------------------------------------

Before me. Judge of the Birmingham District Court of Jefferson County, Alabama, personally appeared, Darrell Reid, Deputy Sheriff who after being duly sworn, upon his oath, deposes and says as follows:

That I am currently an Investigator, Deputy Sheriff with the Jefferson County Sheriff's Office. Jefferson County. Alabama.

That I am currently investigating a Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts. 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related crimes involving an individual by the name of Frank Baird.

On September 23, 2005 I conducted a search warrant at the business, Amtax owned and operated by Frank Baird at 415 Main Street, Warrior. Al. Four Computers, peripheral devices, disk, CDs and other digital media storage devices were located and seized during the search warrant.

Photographs of a girl named Lacie Rhodes were located in a locked filing cabinet next to Frank Baird's office where the computers were located. These photographs were determined to have been taken prior to March 17, 2003 when Lacie Rhodes was 16 years of age. Lacie Rhodes Date of Birth is 2/22/87 according to her Alabama Driver License. Additional photographs of Lacie Rhodes during 2003 when she was 16 years of age show her in various poses with no clothes on and she is posing in sexual explicit manners. In addition there were photographs of her masturbating with a purple in color sex toy, commonly referred to as a "dildo" and there are photographs of her with this "sex toy" in her mouth and on her exposed vagina. In addition. during this search warrant, definitions from Alabama Law concerning Child Pornography and Solicitation of a Minor were located in Frank Baird's office near the computers. These items came from a search warrant executed on September 23, 2005 at Frank Baird's office. I

On September 26, 2005 I executed an additional search warrant at Frank Baird's house. Video tapes were located and later reviewed by investigators. These video tapes actually show Frank Baird in 2003 taking photographs of Lacie Rhodes and have him posing her in different sexually explicit poses. In addition. I located CDs and Disk from this residence. indicating that Frank Baird had a computer at this residence in that past. At both his business and the house located at 601 Arkadelphia Road. Warrior. Al contained photographs. videos, and other digital media. I located a hay barn out back. where I recognized some of the photographs seized had been taken. I did not see the bed or dark red bed cover in this residence. During the investigation I discovered that Frank Baird also owned property at 315 Louisa Street, Warrior, Al. I checked the property files and it indicated that Frank Baird owned the house at 315 Louisa Street.

On September 27, 2005 I interviewed Frank Baird at the Jefferson County Jail, post-miranda. He admitted to knowingly taking photographs of children under the age of 17 in sexually explicit poses.

He also admitted to owning the house located at 315 Louisa Street. Warrior, Al. I went to that house on September 27, 2005 and found that no one was home. There was an open window with no window covering. I was clearly able to see a bedroom with a tripod and video camera set up near a bed. The bedding matched the bedding I observed in the photographs and videos produced by Frank Baird that included the children under that age of 17. Specifically a dark red colored bed cover. I also recognized the headboard as being from the same bed in the video and photographs.

Based on past experience, numerous investigations, training, computer forensic examinations provided to me, and information provided to me by other trained investigators. I have become knowledgeable in the use of computers and peripheral devices to facilitate crimes such as Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related crimes. I therefore have probable cause to believe and do believe that Frank Baird was using computers and peripheral devices to facilitate the crime of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related crimes as listed above and that Frank Baird has stored in his computers hard drives, computer peripheral devices and other electronic storage devices: documents, records, and other types of information on those devices located in the house owned by Frank Baird at 315 Louisa Street, Warrior, Al that are evidence in the crime of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate. 18 U.S.C. § 2256 and other related crimes.

As described in this affidavit computer hardware, software, and data are instrumentalities and evidence in the commission of this crime. Based on my training and experience. I know that searching and seizing information from computers requires all electronic storage devices (along with related peripherals) to be searched later by qualified computer experts in a controlled environment.

A search of computer records, both text and image files will need to be conducted off-site. These devices are already in the possession of the Jefferson County Sheriff's Office and an off-site search is necessary because computer storage devices (like hard disk drives, floppy diskettes, CD-ROM's, DVD-ROM's, etc.) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files and/or programs are evidence or instrumentalities of crime. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site. Further, searching computer systems for

criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. so it is difficult to know before a search which expert is qualified to analyze the system and its data. Data search procedures require exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased. compressed. password-protected. or encrypted files.

Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap") it is necessary to make an exact bit for bit copy or a "forensic image" of the evidence in a controlled environment to ensure that the original data is not altered and that a complete and accurate analysis is performed.

Based on my training, experience and consultation with technical computer experts. I know that searching computerized information for evidence or instrumentality's of crime commonly requires the seizure of all of a computer system's input/output peripheral devices (including related documentation. passwords, and security devices) so that a qualified computer expert can accurately retrieve the system's data in a controlled environment. Peripheral devices that allow user to enter and retrieve data from storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system it is important that the analyst be able to properly retrieve the evidence listed above.

In addition, the analyst needs the relevant system software (Operating Systems. interfaces, and hardware drivers) any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

Definitions:

Hardware: "The physical components or equipment that makes up a computer system..." Examples include keyboards, monitors, and printer.

Software: "The programs or instructions that tells a computer what to do." This includes system programs. which control the internal operation of the computer system (such as Microsoft's Windows XP, Macintosh OSX, Linux. etc.) and applications Programs that enable the computer to produce useful work (e.g., a word processing program such as WordPerfect).

Data: "A formalized representation of facts or concepts suitable for communication. interpretation, or processing by people or by automatic means." Data is often used to refer to the information stored in the computer.

input/output Device: a piece of equipment. which sends data to, or receives data from a computer. Keyboards. monitors. and printers are all common input/output devices.

Network: A system of interconnected computer systems and terminals."

Based on past experience, training, prior investigations and information relayed to me by other trained investigators the seizure of computers and peripheral devices are necessary for an off-site search to be conducted by personnel particularly trained in retrieving data from these devices and that actually capturing hard-drive information on-site is difficult and our current devices and software does not allow us to mirror-image the hard drive on-site.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, evidence of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related crimes is located in computers, digital media, CDs, video cameras, and peripheral devices and other electronic items listed below is located upon or within the aforesaid property, and the above described is subject to seizure and makes this affidavit so that a warrant may issue to search the said premises, place or thing.

 I therefore have probable cause to believe and do believe that the house, 1 story, beige with white post on the porch, located at 315 Louisa Street, Warrior, Al contains computers, video camera with tripod, dark red bed cover, sex toys, purple sex toy, peripheral devices, disk, CDs and other digital media storage devices and this house is subject to being searched.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, i.e., evidence of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related crimes is located upon or within the aforesaid property, and the above described is subject to seizure and makes this affidavit so that a warrant may issue to search the said premises, place or thing.

Subscribed and sworn before me
This _____ September, 2005

_____
AFFIANT

_____
JUDGE, DISTRICT
JEFFERSON COUNTY, ALABAMA

BIRMINGHAM DISTRICT COURT                    SEARCH WARRANT

STATE OF ALABAMA

---------------------------------------------------------------------------------------------------------------------

TO:    ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA.

        Proof by affidavit having this day been made before me as Judge of the Birmingham
District Court of Jefferson County, Alabama and the Court's finding that grounds for the
issuance exist or that there is probable cause to believe that:

        Evidence of crimes to wit: Possession of Child Pornography, Endangering the Welfare of
a Child, Production of Child Pornography, 13A-12-191 Dissemination of public display of
obscene matter containing visual reproduction of persons under 17 years of age involved in
obscene acts, 13A-12-192 Possession and Possession with intent to disseminate obscene matter
containing visual reproduction of persons under 17 years of age involved in obscene acts; prima
facie evidence of possession with intent to disseminate, 18 U.S.C § 2256 and other related crimes
are located on four computers, peripheral devices, disks, CDs and other digital media storage
devices as described in attachment A that were seized in search warrants conducted on
September 23, 2005 and September 26, 2005 at the business and residence of Frank Baird now
located at the Jefferson County Sheriff's Office, 2200 8th Ave North, Birmingham, Alabama
35203.

        You are therefore commanded to make, an immediate search of the property described
above, for the above described evidence, and if you find the same, or any part thereof to seize the
same and hold it until further order from the Birmingham District Court of Jefferson County,
Alabama.  And you are hereby commanded to make a return of this writ within ten (10) days as
required by law.

        Issued to Deputy Carl Carpenter at __1 0__    A.M/P.M.

        Dated this September 29, 2005

                                                        _____
                                                        JUDGE, BIRMINGHAM DISTRICT COURT
                                                        OF JEFFERSON COUNTY, ALABAMA

EXHIBIT
G

## ATTACHMENT A

## ITEMS TO BE SEARCHED FOR AND SEIZED

3. Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

   a. any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tapes, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange Formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

   b. books and magazines containing visual depictions of minors engaged n sexually explicit conduct, as defined in 18 U.S.C. § 2256;

   c. originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   d. motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

4. Information or correspondence pertaining to the possession or attempted distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited:

   a. envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

      b.  books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail  or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

3. Records or other items which evidence ownership of use of computer equipment found in the above residence, including but not limited to, sales receipts, bills for Internet access, and handwritten notes.

CR 64

JEFFERSON COUNTY DISTRICT COURT                                    AFFIDAVIT FOR

STATE OF ALABAMA                                                 SEARCH WARRANT
---------------------------------------------------------------------------------------------------------------------

Before me, Judge of the Birmingham District Court of Jefferson County, Alabama, personally
appeared, Deputy Carl Carpenter who after being duly sworn, upon his oath, deposes and says as
follows:

That I am currently a Deputy Sheriff, Computer Forensic Examiner with the Jefferson County
Sheriff's Office, Jefferson County, Alabama.

That Investigator Darrell Reid from the Jefferson County Sheriff's Office is currently
investigating a Possession of Child Pornography, Endangering the Welfare of a Child,
Production of Child Pornography, 13A-12-191 Dissemination or public display of obscene
matter containing visual reproduction of persons under 17 years of age involved in obscene acts;
prima facie evidence of possession with intent to disseminate, 18 U.S.C. § 2256 and other related
crimes involving an individual by the name of Frank Baird.

On September 23,2005 the Jefferson County Sheriff's Office conducted a search warrant at the
business of Amtax owned and operated by Frank Baird at 415 Main Street, Warrior, AL.

Four Computers, peripheral devices disks, CDs and other digital media storage devices were
located and seized during the search warrant. The computers are:

Search Warrant Number M4 - Hewlett Packard Desk Top Serial Number P6235A
Search Warrant Number M5 – Hewlett Packard Desk Top Serial Number MX229A2769
Search Warrant Number M6 – Hewlett Packard Desk Top Serial Number MXK43716JR
Search Warrant Number M7 – Hewlett Packard Desk Top Serial Number KR04239726

Photographs of a girl named Lacie Rhodes were located in a locked filing cabinet next to Frank
Baird's office where the computers were located. These photographs were determined to have
been taken prior to March 17, 2003 when Lacie Rhodes was 16 years of age. Lacie Rhodes' date
of birth is 2/22/1987 according to her Alabama Driver's License. Additional photographs of
Lacie Rhodes during 2003 when she was 16 years of age show her in various poses with no
clothes on and she is posing in sexually explicit manners. In addition there were photographs of
her masturbating with a purple in color sex toy, commonly referred to as a "dildo" and there are
photographs of her with this "sex toy" in her mouth and on her exposed vagina. In addition,
during this search warrant, definitions from Alabama Law concerning Child Pornography and
Solicitation of a Minor were located in Frank Baird's office near the computers.

On September 26, 2005 an additional search warrant was executed at Frank Baird's residence,
located at 601 Arkadelphia Road, Warrior, AL by Deputy Darrell Reid. I was present for this
search warrant. Video tapes were located and later reviewed by investigators and myself. These
video tapes actually show Frank Baird in 2003 taking photographs of Lacie Rhodes and have
him posing her in different sexually explicit poses. Another video that was reviewed was labeled
"Savannah Atl 03" In this video Frank Baird videotapes himself posing another young white

female in sexually explicit poses so he can take still photographs. It also shows him solicit sexual intercourse from the female for $300, her acceptance to the arrangements and the subsequent acts of performance of oral sex on her and sexual intercourse together. Still photographs were located in the office of Frank Baird that appears to corroborate the video. The time stamp on the back of the photographs is 15 Apr 2003. The time labeled on the envelope and CD with the photographs in 6/13/2003. The female Savannah has been identified as Savannah Brooke Droxler, with a date of birth of 8/18/1987 according to her Alabama State Driver's License. This would make her 15 years of age at the time of the event.

Based on past experience, numerous investigations, training, computer forensic examinations provided to me, and information provided to me by other trained investigators. I have become knowledgeable in the use of computers and peripheral devices to facilitate crimes such as Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination of public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and Possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C § 2256 and other related crimes. I therefore have probable cause to believe and do believe that Frank Baird was using computers and peripheral devices to facilitate the crime of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination of public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and Possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C § 2256 and other related crimes as listed above and that Frank Baird has stored in his computers' hard drives, computer peripheral devices and other electronic storage devices; images, documents, records, and other types of information on those devices that are evidence in the crimes of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination of public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and Possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C § 2256 and other related crimes..

As described in this affidavit computer hardware, software, and data are instrumentalities and evidence in the commission of this crime. Based on my training and experience. I know that searching and seizing information from computers requires all electronic storage devices (along with related peripherals) to be searched later by qualified computer experts in a controlled environment.

A search of computer records, both text and image files will need to be conducted off-site. These devices are already in the possession of the Jefferson County Sheriff's Office and an off-site search is necessary because computer storage devices (like hard disk drives, floppy diskettes, CD ROM's, DVD ROM's, etc.) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he might store it in

random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files and/or programs are evidence or instrumentalities of crime. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site. Further, searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. Data search procedures require exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.

Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap") it is necessary to make an exact bit for bit copy or a "forensic image" of the evidence in a controlled environment to ensure that the original data is not altered and that a complete and accurate analysis is performed.

Based on my training, experience and consultation with technical computer experts, I know that searching computerized information for evidence or instrumentality's of crime commonly requires the seizure of all of a computer system's input/output peripheral devices (including related documentation, passwords, and security devices) so that a qualified computer expert can accurately retrieve the system's data in a controlled environment. Peripheral devices that allow user to enter and retrieve data from storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system it is important that the analyst be able to properly retrieve the evidence listed above.

In addition, the analyst needs the relevant system software (Operating Systems, interfaces, and hardware drivers) any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

Definitions:

Hardware: "The physical components or equipment that makes up a computer system..." Examples include keyboards, monitors, and printer.

Software: "The programs or instructions that tells a computer what to do." This includes system programs, which control the internal operation of the computer system (such as Microsoft's Windows XP, Macintosh OSX, Linux, etc.) and applications Programs that enable the computer to produce useful work (e.g., a word processing program such as WordPerfect).

Data: "A formalized representation of facts or concepts suitable for communication, interpretation, or processing by people or by automatic means." Data is often used to refer to the information stored in the computer.

Input/output Device: A piece of equipment, which sends data to, or receives data from a computer. Keyboards, monitors, and printers are all common input/output devices.

Network: A system of interconnected computer systems and terminals."

Based on past experience, training, prior investigations and information relayed to me by other trained investigators I know that the seizure of computers and peripheral devices are necessary for an off-site search to be conducted by personnel particularly trained in retrieving data from these devices and that actually capturing hard-drive information on-site is difficult, impractical and time consuming.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, evidence of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination of public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and Possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C § 2256 and other related crimes is located in the computers' hard drives, and peripheral devices and other electronic items listed on the attached form is located upon or within the aforesaid property, and the above described is subject to seizure and makes this affidavit so that a warrant may issue to search the said premises, place or thing.

I therefore have probable cause to believe and do believe that the computers listed above, peripheral devices, disks, CDs and other digital media storage devices; which were seized in the search warrant conducted on September 23, 2005 at Frank Baird's Office, Amtax, 415 Main Street, Warrior, AL and during the search warrant at his residence at 601 Arkadelphia Road, Warrior, AL; that are in the custody of the Jefferson County Sheriff's Office at 2200 8th Avenue North, Birmingham, Al is subject to being searched.

Based on the above facts, your affiant has sufficient reason to believe and does believe that the above described property, i.e., evidence of Possession of Child Pornography, Endangering the Welfare of a Child, Production of Child Pornography, 13A-12-191 Dissemination of public display of obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts, 13A-12-192 Possession and Possession with intent to disseminate obscene matter containing visual reproduction of persons under 17 years of age involved in obscene acts; prima facie evidence of possession with intent to disseminate, 18 U.S.C § 2256 and other related crimes is located upon or within the aforesaid property, and the above described is subject to seizure and makes this affidavit so that a warrant may issue to search the said premises, place or thing.

Subscribed and sworn before me
This September 29, 2005

AFFIANT

JUDGE, DISTRICT
JEFFERSON COUNTY, ALABAMA

## ATTACHMENT A

## ITEMS TO BE SEARCHED FOR AND SEIZED

1. Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including, but not limited to:

    a. any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tapes, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange Formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; and/or distribute, receive, or possess child pornography, or information pertaining to an interest in child pornography, or information pertaining to an interest in child pornography;

    b. books and magazines containing visual depictions of minors engaged n sexually explicit conduct, as defined in 18 U.S.C. § 2256;

    c. originals, copies, and negatives of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

    d. motion pictures, films, videos, and other recordings of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

2. Information or correspondence pertaining to the possession or attempted distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, that were transmitted or received using computer, some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited:

    a. envelopes, letters, and other correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256; and

   b.  books, ledgers, and records bearing on the production, reproduction, receipt,
       shipment, orders, requests, trades, purchases, or transactions of any kind
       involving the transmission through interstate or foreign commerce including by
       United States mail  or by computer of any visual depiction of minors engaged in
       sexually explicit conduct, as defined in 18 U.S.C. § 2256;

3. Records or other items which evidence ownership of use of computer equipment found in the
above residence, including but not limited to, sales receipts, bills for Internet access, and
handwritten notes.